STATE of Missouri, Respondent,

v.

Walter Junior BLAIR, Appellant.

No. 62782.

Supreme Court of Missouri,
En Banc.

Aug. 31, 1982.

Rehearing Denied Oct. 7, 1982.

Phillip H. Schwarz, Gerald M. Handley, Kansas City, for appellant.

John Ashcroft, Atty. Gen., John M. Morris, Asst. Atty. Gen., Jefferson City, Robert DaKopolis, Pros. Atty., Kansas City, for respondent.

BARDGETT, Judge.

Appellant was convicted of capital murder, § 565.001, RSMo 1978, and sentenced to death by a jury pursuant to § 565.008, RSMo 1978. This Court has jurisdiction for this original appeal under Mo.Const. art. V, § 3. Review includes consideration of both alleged trial errors and the death sentence. § 565.014.

The jury could reasonably have found that on April 2, 1979, Kathy Jo Allen was allegedly raped by Larry Jackson at her apartment. Thereafter, Jackson was arrested, charged with the rape, and placed in custody in the Jackson County Jail on this and other charges.[1] While in jail, Jackson attempted to prevent Miss Allen from testifying against him. He made four or five threatening telephone calls to Miss Allen, and other phone calls were made to her by Jackson's girl friend and by a Jackson County Jail inmate posing as an attorney. When these efforts proved unsuccessful, Jackson approached other inmates in the Jackson County Jail and asked if they would keep Miss Allen from appearing in court. Several inmates referred Jackson to appellant, who had been released from the Missouri State Penitentiary about eight months previously and who was then in the same jail. According to appellant's confession, he had a reputation in jail of not being afraid of anyone and of "being able to hold my own." Sometime during June or July

of 1979, Jackson met appellant in the maximum security section of the jail and offered appellant $2,000 to keep Miss Allen from testifying. During subsequent conversations, Jackson told appellant he wanted the rape victim killed, preferably by putting a bomb in her apartment. Jackson further stated that his brother had some money coming in from a car accident and that this money would be used to pay appellant.

On July 16, 1979, appellant was released on bond from the Jackson County Jail. Appellant then spoke with Jackson, who was still in jail, several times by telephone about the proposed murder and Jackson raised his offer to $6,000. At some time after his release, he went to visit members of the Jackson family "to see if [the proposal] was for real." The family gave him Kathy Jo Allen's address and telephone number and provided him with a car (1964 Oldsmobile) which he could use to keep her under surveillance.

On Friday, August 17, three days before Miss Allen was scheduled to go to court and testify regarding the rape, appellant told a friend, Ernest Jones, that he was going to watch the "white girl" that night and that he might "take her out [kill her]." The next day when appellant saw Jones, he told Jones that he had seen the girl and her boyfriend having sex and that if he had had a gun he would have killed them both. At around 8:00 or 9:00 p.m. that same evening of Saturday, August 18, appellant met Ernest Jones at a community center and showed him a .32 caliber pistol which appellant said he had stolen out of a car that day. At 2:00 or 2:30 a.m. that morning (Sunday, August 19), appellant and his girl friend, Sharon Jones, left Ernest Jones's residence and went to the home of appellant's mother, where appellant lived. Several minutes after they arrived at the house, appellant left, telling Sharon Jones that he was "going to kill the white bitch" and that he would be back before sunrise. According to Sharon Jones, appellant wore a dark gold

---

1. After the alleged rape of Miss Allen, Jackson committed a murder and robbery. *State v.* *Jackson,* 608 S.W.2d 420 (Mo.1980).

hooded shirt or sweater, blue jeans, high-topped black tennis shoes, and black leather driving gloves.

After leaving his house, appellant walked to the apartment of Kathy Jo Allen, where he hid across the street and watched for suspicious activity. Seeing none, appellant stood under the apartment bedroom window, removed the screen, and entered the bedroom. At this time Miss Allen and her boyfriend, Robert, were asleep on a mattress in the living room. Appellant took Robert's wallet and watch from a table and removed a pillow case which he wrapped around the lower part of his face. At around 6:00 a. m., Robert woke up. Appellant pointed the gun and told Robert to stay where he was and, when Robert began to sit up, said, "If you move again ... I'll blow your f_____ brains all over this room." When Miss Allen awoke, appellant stated that he was just there to rob them and that he was not going to hurt or kill anyone. Appellant removed the money from Robert's wallet and took a man's diamond ring which Robert had attempted to hide under his pillow. Appellant said that he wanted Kathy to act as his driver and ordered her to get dressed. He refused Robert's offer of the keys to his car and Robert's suggestion that he (Robert) act as driver. As appellant and Allen prepared to leave, appellant told Robert that Allen would be right back in seven to ten minutes. Appellant took Miss Allen to her car and the two drove away. Robert called the police. He had not seen appellant's full face, but gave a description of appellant's height, weight, age, and clothing. This description matched that of appellant, although Robert tentatively identified Ernest Jones in a lineup as the perpetrator.

At around 6:30 a. m., a woman named Moore who lived on E. 34th Street in Kansas City heard screaming and two gunshots, another scream, and a third shot. Shortly thereafter, she saw a black male walk past her house. At approximately 7:00 a. m., police found the body of Kathy Jo Allen next to her abandoned car in a vacant lot at 34th and Tracy. This location was four blocks from appellant's home. The victim was nude from the waist up (her blouse was found nearby) and had been shot in the head, chest, and wrist. Subsequent examination of the gunpowder burns around the wounds indicated that the shots had been fired from close range, in the area of two to two and one-half feet away. The body also bore abrasions and lacerations which were consistent with the victim's being struck in the head with a brick before her death. Also found at the scene were an expended bullet discovered under the body and several tennis shoe footprints around the victim, which were photographed.

Also at around 7:00 a. m. that morning, appellant returned to his mother's house. When he arrived, his girl friend (Sharon Jones) observed that he was out of breath and that he was carrying a pillowcase with objects in it. Appellant emptied the pillowcase on the floor and Jones saw a brown purse, a silver diamond ring, two watches, and appellant's gun and gloves. Shortly thereafter, appellant heard police helicopters circling overhead. He put the items back in the pillowcase and left the house. An hour later, he returned without the pillowcase but wearing the man's watch and the ring. That day (Sunday, August 19), appellant and Sharon Jones went over to Ernest Jones's house. Appellant told Ernest Jones how he had abducted Kathy Jo Allen and that at the vacant lot "he hit her with a brick and that she wouldn't fall so he shot her." Appellant passed around the diamond ring and man's watch he had taken and also displayed the driver's license of Kathy Jo Allen. Appellant stated that all he had to do was to show the victim's driver's license to Larry Jackson's family and they would pay him. That evening, appellant took Kathy Jo Allen's purse, the stolen pillowcase, and a spent shell casing and burned them in his backyard.

The next day, Monday, August 20, appellant and Ernest Jones went to a pawnshop where they attempted to pawn the stolen diamond ring, but were unable to do so. Nevertheless, they saw an older brother of Ernest Jones, Frederick Jones, who pawned the ring for $50. He gave the money to

Ernest Jones who in turn gave it to appellant. On Tuesday morning, August 21, appellant showed Larry Jackson's relatives the victim's driver's license. Appellant spoke with Jackson by telephone and, according to appellant's confession, Jackson said that he appreciated what appellant had done, loved him like a brother, and that appellant would get the promised $6,000. Also that morning, police arrested Frederick Jones, who had pawned the ring, and shortly thereafter took Ernest Jones into custody. When appellant heard about these arrests, he gave Ernest Jones's girl friend, Tina Jackson, a telephone number and told her to have Ernest call him at that number so he could provide Ernest and Frederick with bond money. Appellant said that Ernest should ask for "Cody" when he called. That afternoon, police interviewed Tina Jackson, obtained from her the telephone number given by appellant and determined that the number corresponded to an apartment at 4406 Tracy rented by Linda Robertson, who was Larry Jackson's sister. When police went to this residence, they were told by Robertson that appellant was not there. Thereafter, officers went to appellant's home, where they were admitted by appellant's mother. In appellant's room, they saw an orange or gold hooded sweater, which they seized. Later analysis of this sweater revealed paint chips consistent with the paint on the outside of Kathy Jo Allen's apartment and cat hair consistent with a cat owned by the victim.

On Wednesday morning, August 22, Ernest Jones assisted police by making two telephone calls to the number given by appellant. Subsequently, assured that appellant was at the location because a person answered by the code name "Cody", police officers entered the apartment of Linda Robertson and found appellant there together with several members of the Jackson family. A man's watch similar to Robert's was found near appellant and a pistol was later found in a closet of the apartment. Forensic analysis of the pistol revealed that two expended bullets found in and near the body of Kathy Jo Allen and a shell cartridge which appellant had burned in his backyard had all been fired from this weapon. After his arrest, appellant was advised of and waived his *Miranda* rights at least two times and thereafter gave an oral and written confession. Later, appellant gave a third confession on videotape after he was again advised of and waived his *Miranda* rights on the videotape. In his consistent and detailed confessions, appellant admitted that while he was in the maximum security section of Jackson County Jail he met Larry Jackson. Jackson thought he could "beat the rape case by keeping the girl from not showing up in court" and offered appellant "$2,000.00 to keep the female from showing up in court, who was going to testify against him on a rape." Larry Jackson "described her apartment . . . and told [appellant] how he raped this girl".

> After we discussed the girl testifying against him and him offering me $2,000.00, he told me, the first time, that he wanted me to just keep her from going to court until he was cut loose. We talked about this eleven or twelve more times and he finally told me that he wanted me to kill her to keep her from testifying. He told me the best way would be to put a bomb in her house to kill her.

> . . . . .

> As the time came closer to court LARRY [Jackson] raised his price to $6,000.00 to get me to keep the girl from coming to court. . . .
>
> This last Saturday night, 8–18–79, while I was at LARRY'S sister's house, . . . LARRY'S brother and his brother's friends had their gas bombs and were going to go over and bomb this girl's apartment and get rid of her. That's when I made up my mind I would take care of the girl for LARRY and told his brother and his brother's friends that I would take care of it. At that time my intentions were to just get the girl and hold her in a vacant house until LARRY JACKSON went to court.

Appellant then described how he had stolen a .32 caliber revolver, entered Miss Allen's

apartment, and forced her to drive her car. He admitted the killing for which he had been hired by Jackson, but claimed that he had not intended to kill her and that he shot her only when she grabbed his gun.

As a result of what appellant revealed in his confessions, police found the driver's license of Kathy Jo Allen in a sewer where appellant had hidden it after showing it to the Jackson family, and also located a metal clasp, an expended shell casing, and a check, although burned still containing the printed name of Kathy Jo Allen, in appellant's backyard. The footprints found near the victim's apartment and at the scene of her murder were found to closely resemble the black tennis shoes worn by appellant at the time of his arrest.

On August 31, 1979, appellant was charged by indictment with capital murder.[2] The trial began with voir dire on September 30, 1980. After extensive and individual voir dire, the jury was empaneled on Friday, October 3, 1980. On Monday, October 6, 1980, opening statements were made by each party. After the state had introduced appellant's confessions, numerous witnesses to tie the physical evidence to appellant, and the testimony of several witnesses to whom appellant had admitted the killing of or that he was going to kill Miss Allen, appellant testified and called seven other witnesses in his defense. His theory of defense was essentially that Ernest Jones had committed the murder, and that appellant's confessions were all false and had been coerced by the threats and promises of police officers. Appellant admitted to prior convictions for assault with intent to rob with malice aforethought and attempted second-degree burglary.

At the close of the evidence, the court submitted to the jury instructions on capital

murder, second-degree (intentional) murder, and manslaughter. At 11:52 a. m. on Thursday, October 16, 1980, the jury retired to deliberate. That same day at 6:48 p. m. the jury returned a verdict finding appellant guilty of capital murder. At the punishment-stage proceeding, the only evidence introduced were certified copies of appellant's two prior convictions, submitted by the state. After the supplemental instructions and arguments of counsel, the jury retired to deliberate and consider the punishment at 11:15 a. m. on Friday, October 17, 1980. At 2:35 p. m., the jury reached a verdict with regard to punishment and imposed a sentence of death. The verdict form listed four aggravating circumstances that the jury found beyond a reasonable doubt:

1. The defendant, Walter Blair, murdered Kathy Jo Allen for the purpose of receiving money or anything of monetary value.

2. The defendant, Walter Blair, as an agent or employee of Larry Jackson and at his direction, murdered Kathy Jo Allen.

3. The murder of Kathy Jo Allen involved torture and depravity of mind and that as a result thereof it was outrageously and wantonly vile and inhuman.

4. The murder of Kathy Jo Allen was committed for the purpose of interfering with a lawful custody in a place of lawful confinement of Larry Jackson.

Appellant then brought this appeal from his conviction and sentence, making thirteen assignments of error.

I

Appellant first contends that under *State v. Gardner,* 618 S.W.2d 40 (Mo.1981), and *State v. Wilkerson,* 616 S.W.2d 829 (Mo. banc 1981), the trial court erred in failing to

2. The indictment read:

The Grand Jurors of the County of Jackson, State of Missouri charge that the defendant, WALTER JUNIOR BLAIR, in violation of section 565.011 RSMo [sic], committed the class "A" felony of capital murder punishable upon conviction under section 565.008.1 RSMo, in that the defendant, WALTER JUNIOR BLAIR, either acting alone or knowingly

in concert with another, wilfully, knowingly, with premeditation, deliberately and unlawfully killed Katherine Jo Allen by shooting her on or about the 19th day of August, 1979 in the County of Jackson, State of Missouri, thereby causing her to die on the 19th day of August, 1979 in the County of Jackson, State of Missouri.

give an instruction on first-degree murder (§ 565.003) because there was evidence that the murder occurred during the commission of kidnapping, burglary, and robbery.

First-degree murder is not a lesser-included offense of capital murder and therefore the court did not err in failing to instruct on first-degree (felony) murder. *State v. Baker,* 636 S.W.2d 902 (Mo. banc 1982).

Where appellant was only indicted for capital murder, it would have been error for the trial court to have instructed on first-degree murder. "A court may not instruct on an offense not specifically charged in the information or indictment unless it is a lesser included [or lesser degree] offense. This is because due process requires that a defendant may not be convicted of an offense not charged in the information or indictment." *State v. Smith,* 592 S.W.2d 165, 165 (Mo. banc 1979). *See also* Mo. Const. art. I, § 17.[3] Of course, the state if it chose to charge or seek an indictment of first-degree murder in addition to capital murder, which would allow an instruction on first-degree murder, could do so. Rule 23.05. But such is not the instant case. Nor is this a situation where a defendant charged only with capital murder requests and gets an instruction on first-degree murder, and then is convicted of first-degree murder. The point is overruled.

## II

■ Appellant next contends that his confessions should have been suppressed because they were the products of an illegal arrest and were involuntary.

He alleges first that the illegal arrest tainted the confessions because there were no intervening events breaking the causal connection between the illegal arrest and the confessions so that the confessions were "sufficiently an act of free will to purge the primary taint." Hence, the confessions

were inadmissible under *Dunaway v. New York,* 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979), and *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). *See also Taylor v. Alabama,* —— U.S. ——, 102 S.Ct. 2664, 73 L.Ed.2d 314 (1982). The threshold question is whether appellant's arrest was illegal. *Taylor,* 102 S.Ct. at 2667. We hold it was not an illegal arrest.

On Tuesday, August 21, 1979, two days after the murder of Kathy Jo Allen, Kansas City police officers discovered that a silver diamond ring taken from the victim's boyfriend at the time of her abduction had been pawned at a local pawnshop by Frederick Jones. Based on this information, police arrested Frederick Jones and later took into custody his brother, Ernest Jones, and learned from their statements that the actual possessor of the stolen ring was appellant. From the statement of Ernest Jones and Sharon Jones, appellant's girl friend, the officers were informed that appellant had committed the murder of Kathy Jo Allen. In addition, police officers had recovered a gold hooded shirt, identified by appellant's mother as appellant's, and matching Robert's description of the assailant's shirt.

Later, Tina Jackson, Ernest Jones's girl friend, received a telephone call from appellant in which appellant gave her a telephone number where he could be reached (telling her to have the caller use the code name "Cody"), so he could provide bond for Ernest and Frederick Jones. This information was given to police. The investigating officers determined that this telephone number belonged to an apartment occupied by Linda Robertson, a sister of Larry Jackson, and went to her apartment to inquire whether appellant was there. Robertson answered the officer's knock and told them that appellant was not there and the officers left without entering the apartment.

---

3. In *Watson v. Jago,* 558 F.2d 330 (6th Cir. 1977), the court held that where a defendant was forced to defend against felony murder when he was charged only with deliberate and premeditated murder, the resulting conviction was a denial of due process under the fourteenth amendment. In that case Ohio law made it clear that premeditated murder and felony murder were two separate offenses. *Id.* at 334–35.

At around 9:00 a. m. on the next day (August 22), the police had Ernest Jones call Linda Robertson's apartment again and, by asking for "Cody", he and the police determined that appellant was there. Police then surrounded the Robertson apartment and Jones made a second call and engaged appellant in conversation. While this occurred, a single police officer, Detective Clarence Luther, knocked on the apartment door and when asked who was there identified himself as a police officer. After he did so he heard the sound of one or more persons running from the front of the apartment to the back, away from the door. When the door was opened by Linda Robertson, Detective Luther stated that he was there looking for Walter Blair and asked if he was there. In reply, Ms. Robertson opened the apartment door wide and stepped back, and Detective Luther entered the apartment. Luther walked toward the back of the apartment (the direction of the running) and saw through an open bedroom door three men lying fully clothed on mattresses feigning sleep. The police officer recognized one of the men as appellant and placed him under arrest.

■ The police had facts sufficient for a prudent person to believe that appellant had committed the murder. *State v. Berry,* 609 S.W.2d 948, 952 (Mo. banc 1980). Probable cause existed for the arrest. Although appellant also complains that he was arrested without a warrant, he was arrested with probable cause in a third person's apartment where there was substantial evidence for the trial court to find that the lessee of the apartment consented to the entry and search. Appellant cannot be heard to complain. *See Steagald v. United States,* 451 U.S. 204, 211–12, 218–19, 101 S.Ct. 1642, 1647–48, 1650–51, 68 L.Ed.2d 38 (1981). *Cf. Payton v. New York,* 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980).

■ Appellant additionally alleges that his confessions were involuntary. This places the burden on the state to prove that the statements were voluntary. *State v. Olds,* 569 S.W.2d 745, 751 (Mo. banc 1978). Nevertheless, our review is limited to

whether the trial court's findings are supported by substantial evidence. *State v. Olinghouse,* 605 S.W.2d 58, 66 (Mo. banc 1980); *State v. Higgins,* 592 S.W.2d 151, 158 (Mo. banc 1979), *appeal dismissed,* 446 U.S. 902, 100 S.Ct. 1825, 64 L.Ed.2d 254 (1980).

■ At the suppression hearing, appellant testified that while at the police station an officer put a rifle to the back of appellant's head, after forcing him to kneel, and threatened to shoot him, promised him twenty to twenty-five years' imprisonment if he would confess, and promised that Linda Robertson would not be held for murder and her children taken away from her if appellant were to confess.

Nevertheless, other evidence introduced at the suppression hearing was sufficient so that the trial court could reasonably have found that after appellant's arrest, he was transported to the Kansas City police headquarters. There, he was interviewed by two police officers, who first advised appellant of his *Miranda* rights and then gave him a *Miranda* form to read. In response, appellant signed the written *Miranda* waiver and told the officers that "*he didn't want an attorney*". No threats or promises of any kind were made to appellant at this or any other time during the interview, and no guns were displayed by the interviewing officers. Appellant was not detectably under the influence of alcohol or drugs, and his demeanor during the interview was described as "cocky" and sure of himself. After his written waiver, appellant gave an extensive oral confession to the murder, which began at 9:57 a. m. and lasted something less than two hours. Appellant was then asked if he would be willing to make a written statement and, when he agreed, a typist was obtained. From 11:54 a. m. to around 2:00 p. m., appellant gave a second statement after signing a waiver wherein the officers's questions and his answers were reduced to a seven-page typed statement. Appellant then read through the statement, signed it and initialed each page. Various breaks were taken during the questioning process and appellant was offered and refused coffee, soft drinks, and cigarettes.

After appellant's written statement had been completed and signed, he was taken across the street to the warrant office of the Jackson County prosecutor's office. While there, appellant was asked if he would be willing to give his confession on videotape and was told that he would have an attorney present if he desired. Appellant agreed to make a videotaped statement and repeatedly stated that he did not want an attorney. As appellant was being transported by officers to the grand jury room where the videotaping would take place, they encountered Kevin Locke, an assistant public defender who represented appellant on an unrelated charge. As appellant passed, Locke greeted him and appellant made an unknown reply, whereupon appellant and the accompanying officers continued on. Locke then demanded to speak with appellant and was refused. Mr. Locke did not represent appellant on the murder charge. At the beginning of his videotaped statement, appellant was again advised of his *Miranda* rights and again waived them. Appellant then made his third confession to the murder of Kathy Jo Allen.

The totality of the circumstances, including appellant's signed waiver forms after being repeatedly given *Miranda* warnings together with his detailed, consistent confessions, provide substantial evidence that appellant's confessions were voluntary—the products of an essentially free and unconstrained choice of their maker. Nor does the fact that Kevin Locke requested to speak with appellant dictate another result. Although Locke represented appellant on an unrelated charge, appellant made no request for any attorney and in fact repeatedly stated that he did not want an attorney. The trial court did not err in overruling appellant's motion to suppress his confessions.

### III

Appellant argues that the pistol, watch, and shoes taken from the place of his arrest should have been suppressed because they were the products of an illegal arrest, there was no voluntary consent to search the premises, and the search warrant was based on illegal entry and involuntary consent.

Appellant's arrest was proper. *See* point II *supra*. After appellant was arrested, the arresting officer, Detective Clarence Luther, in a place where he had the right to be, inadvertently discovered in plain view on the floor near appellant a man's wristwatch which resembled the one taken from Kathy Jo Allen's boyfriend at the time she was abducted and murdered, and a pair of gloves which resembled the ones the assailant had been described as wearing. It was apparent that these were evidence and Detective Luther seized them. *State v. Strickland,* 609 S.W.2d 392, 395 (Mo. banc 1980); *State v. Clark,* 592 S.W.2d 709, 713 (Mo. banc 1979), *cert. denied,* 449 U.S. 847, 101 S.Ct. 132, 66 L.Ed.2d 57 (1980). After appellant had been placed in the police car, Detective Luther seized appellant's shoes because they matched the description and tread pattern of those worn by the murderer.

Thereafter, Linda Robertson, the lessee of the apartment, executed a written consent to search her apartment. She was handed the form which described the .32–20 pistol to be looked for. In the presence of two or three officers, with no evidence of any force used or weapons displayed, she signed the consent form. Assuming appellant even had a legitimate expectation of privacy in the area searched, there was substantial evidence to support a finding that written consent, given by the lessee of the apartment, was voluntarily given. *See State v. Csolak,* 571 S.W.2d 118 (Mo.App. 1978).

After the consent form had been signed, a police dog sensitive to nitrates, an ingredient in gunpowder and explosives, was taken through the apartment. The dog indicated the presence of nitrates in a box in a closet. A search warrant was then obtained. The box was searched pursuant to the warrant and a .32 caliber pistol was discovered and seized. Forensic analysis subsequently revealed that this pistol was the murder weapon. All the items were validly seized.

## IV

Appellant also contends that a velour shirt seized from a bedroom at his mother's house should have been suppressed because it was taken from a place where he had an immediate expectation of privacy without a search warrant and without his or his mother's permission.

■ The search of property without warrant but with proper consent voluntarily given is valid under the fourth amendment. *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973). That requisite consent to search may be given by a third party who has joint access or control of the premises or effects sought to be searched. *United States v. Matlock,* 415 U.S. 164, 171, 94 S.Ct. 988, 993, 39 L.Ed.2d 242 (1974); *State v. Williams,* 536 S.W.2d 947, 949 (Mo.App.1976).

In the instant case, there was substantial evidence for the trial court to find that appellant lived with his mother and seven brothers and sisters in the house that was owned by his mother. She had not relinquished control over the bedroom and there was evidence that the bedroom was used by other members of the family because there were several beds and mattresses in the room. Appellant's mother clearly had concurrent authority over the part of the premises occupied by appellant to consent to its entry. *Cf. State v. Peterson,* 525 S.W.2d 599 (Mo.App.1975). Appellant argues, however, that even if his mother could consent to the entry of the room, her consent was not voluntary.

■ Whether there was a voluntary consent is to be determined by the totality of the circumstances. *Schneckloth v. Bustamonte, supra.* That determination is dependent on

> many factors including but not limited to the number of officers present, the degree to which they emphasized their authority, whether weapons were displayed, whether the person was already in police custody, whether there was any fraud or misleading on the part of the officers, and the evidence as to what was said and done by the person consenting.

*State v. Rush,* 497 S.W.2d 213, 215 (Mo.App. 1973).

■ The evidence supports a finding that on Tuesday, August 21, the day before appellant's arrest, police officers went to the home of appellant's mother where appellant and his seven brothers and sisters also lived. Mrs. Blair answered the door and, when asked if appellant was in the house, said that he had not been there for a couple of days. The officers told Mrs. Blair that appellant was a suspect in a murder and asked her if they could enter the house and check for the victim's purse and other missing evidence. Mrs. Blair gave the officers permission to come in and directed them to a room on the second floor of the house which she said was appellant's bedroom. On entering the bedroom, they saw in plain view an orange or gold hooded shirt or sweater on a nightstand that matched the description of the clothing worn by the man who abducted Kathy Jo Allen. Mrs. Blair said that this shirt belonged to appellant, gave the officers permission to take it and accepted a written receipt for the seized item. The next day officers returned to Mrs. Blair's house and obtained a second consent to search, this time in writing, but no other evidence was found.

There was substantial evidence in the totality of the circumstances to find that Mrs. Blair voluntarily consented to the search. There were four police officers present when Mrs. Blair gave her consent, however, only two officers went inside. The officers were not hostile or demanding in making their request and did not otherwise emphasize their authority. No weapons of any kind were displayed, nor was Mrs. Blair in police custody, then or ever. The officers candidly admitted their reason for requesting entry into the house and, after they did so, Mrs. Blair not only gave them permission to come into the house but accompanied them upstairs and assisted them by pointing out appellant's room and identifying his clothing. The next day Mrs. Blair also gave her written consent to a search. Viewing all of the facts surrounding the

giving of this consent, and the fact that the shirt, matching the description of the assailant's shirt, was in plain view where the officers had a right to be, was inadvertently discovered and identified by Mrs. Blair as appellant's clothing, the trial court did not err in overruling appellant's motion to suppress the velour shirt.

## V

Appellant next urges that the trial court erred in excluding three venire persons who were not adamantly opposed to the death penalty in violation of *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). The three were part of sixteen jurors and as to all of them appellant alleges that exclusion of those prospective jurors opposed to the death penalty deprived him of a fair cross-section of the community guaranteed by the sixth and fourteenth amendments of the United States Constitution and resulted in a "death-qualified jury", *i.e.,* one more prone to finding appellant guilty.

 Excusing potential jurors for voicing general objections to the death penalty is error violative of constitutional standards. *Witherspoon v. Illinois, supra.* When prospective jurors, however, make it "unmistakably clear ... that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them," *id.* at 522 n.21, 88 S.Ct. at 1777 n.21 they may be properly excluded. *See Davis v. Georgia,* 429 U.S. 122, 123, 97 S.Ct. 399, 400, 50 L.Ed.2d 339 (1976); *State v. Newlon,* 627 S.W.2d 606, 615 (Mo. banc 1982); *State v. Mercer,* 618 S.W.2d 1,- 6 (Mo. banc), *cert. denied,* 454 U.S. 933, 102 S.Ct. 432, 70 L.Ed.2d 240 (1981). In the instant case the three venire persons, Brown, Buddemeyer, and Ivory, were properly excused. The assistant prosecutor stated to the panel:

I will now ask you a question. I'll read it very slowly and, if you will give it your undivided attention, I want to ask you to respond to it when I'm through and, if there is any one of you who does not understand the question or wishes it to be re-read, please raise your hand.

Do you have any moral, conscientious or religious scruples which would make it impossible for you to bring in a verdict of death if you were convinced that such a verdict is fair and just?

. . . . .

MR. BELL [assistant prosecutor]: And your name, ma'am?

VENIREPERSON LEONA M. BROWN: Leona Brown.

MR. BELL: And, Mrs. Brown, I'm not singling you out, and I'm saying this for the benefit of everyone who has thus far responded, but I want you to think very carefully. Is there any circumstance at all that you could ever assess the death penalty?

VENIREPERSON BROWN: I just don't feel like I could. I sure don't.

MR. BELL: Thank you, Mrs. Brown.

VENIREPERSON BROWN: All right.

MR. BELL: And your name, ma'am.

VENIREPERSON LUCILLE E. BUDDEMEYER: Lucille Buddemeyer. I feel the same way.

MR. BELL: Thank you.

Your name, sir?

VENIREPERSON CLESTER C. IVORY: I feel the same way. I don't think I could, no.

MR. BELL: I need that in more positive terms, sir.

VENIREPERSON IVORY: No, I couldn't.

MR. BELL: Thank you.

Again, out of an abundance of caution, to those people who have just responded to this question, I ask you again to stop for just a moment and consider any—and fantacize about any possible situation imaginable. Is there, under no circumstance, any situation in which you could assess the death penalty. Do the people, then, who have responded to this question and have indicated to the Court that they could not assess the death penalty maintain that position? Anyone who's changed their position?

Thank you.

The three venire persons made it "unmistakably clear" that they would vote "against the penalty of death regardless of the facts and circumstances that might emerge in the course of the trial". While they responded in terms of their feelings, they stated those feelings in unambiguous terms. *State v. Mercer*, 618 S.W.2d at 6–7, is controlling.

■ Appellant also challenges the excuse of all sixteen potential jurors opposed to the death penalty because their exclusion (1) deprived him of his right under the sixth and fourteenth amendments to trial by a jury drawn from a fair and representative cross-section of the community and (2) resulted in a "death-qualified jury"—a jury more prone to finding appellant guilty. Both of these arguments have been raised previously and rejected. *State v. Mercer*, 618 S.W.2d at 7–8; *State v. Mitchell*, 611 S.W.2d 223, 228–30 (Mo. banc 1981). In *Mercer* this Court stated:

> The exclusion of those venire persons who have stated unambiguously that they cannot, under any circumstances, consider a certain punishment permissible under the law does not violate representative cross-section requirements of the sixth and fourteenth amendments. *Spenkellink v. Wainwright*, 578 F.2d 582, 597 (5th Cir. 1978), *cert. denied*, 440 U.S. 976, 99 S.Ct. 1548, 59 L.Ed.2d 796 (1979). The right to a representative jury does not include the right to be tried by jurors who have explicitly indicated an inability to follow the law. *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978).
>
> In *Witherspoon v. Illinois, supra*, 391 U.S. at 516, 88 S.Ct. at 1774, petitioners maintained that a jury selected in the manner present in that case, must necessarily be biased in favor of conviction citing two surveys in support. *See Witherspoon v. Illinois, supra* at 517, n.10, 88 S.Ct. at 1774, n.10. The Court found that the data presented was "too tentative and fragmentary to establish that jurors not opposed to the death penalty tend to favor the prosecution in the determina-

tion of guilt," and declined to conclude that the "exclusion of jurors opposed to capital punishment results in an unrepresentative jury on the issue of guilt or substantially increases the risk of conviction." *Id.* at 517–518, 88 S.Ct. at 1774–1775. The Court refused to reverse the conviction. *See also Bumpers v. North Carolina*, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968).

> Following *Witherspoon v. Illinois, supra*, a number of studies were published on a theory that "death-qualified" jurors are not impartial on the issue of guilt. These studies, however, are not conclusive, and this Court will not reverse defendant's conviction on the basis of the studies presented.
>
> Those chosen to be jurors in no way indicated that they were biased for the prosecution or against the defendant; they indicated only that they would consider the death penalty if the law and facts permitted it. As stated in *Spenkellink v. Wainwright, supra* [578 F.2d] at 594:
>
> > [T]he veniremen indicated only that they would be willing to perform their civic obligation as jurors and obey the law. Such persons cannot accurately be branded prosecution-prone.
>
> "A juror wholly unable to ever consider the death penalty no matter what the facts of a given case, would clearly be unable to follow the law . . . in assessing punishment." *Adams v. Texas,* . . . [448 U.S. 38, 44, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980)]. The state has a legitimate interest in administering its death penalty statute which permits it to bar from jury service those whose belief about capital punishment would lead them to ignore the law. *Adams v. Texas, supra. See also State v. Mitchell, supra.*

618 S.W.2d at 7–8 (footnote omitted). The point is overruled.

## VI

Next appellant argues that the trial court erred in not quashing the jury panel because the Jackson County juror selection

system selectively excludes qualified jurors (blacks), thereby denying appellant's sixth and fourteenth amendment rights to a jury selected from a fair cross-section of the community.

In order to present a prima facie case of a fair cross-section (sixth amendment) violation, appellant must show that (1) the underrepresented or excluded group is a "distinctive" group in the community; (2) the representation of this group in jury venires as a whole is not fair and reasonable in relation to the number of such persons in the community; and (3) the under-representation is due to a systematic exclusion of the group in the jury selection process. *Duren v. Missouri,* 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979). Appellant argues that blacks comprise twenty percent of the population in Jackson County, and because Jackson County uses voter registration lists to select jury pools and blacks are underregistered as compared to whites, a distinctive group in the community is systematically excluded from jury venires as a whole.

Without expressing any opinion as to appellant's proof with respect to other prongs of the fair cross-section test, appellant only presents statistical evidence of the composition of his jury panel and petit jury. This is inadequate to show that the representation of this group in jury venires as a whole is not fair and reasonable. As the Court stated in *Taylor v. Louisiana,* 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975):

> [I]n holding that petit juries must be drawn from a source fairly representative of the community we impose no requirement that petit juries actually chosen must mirror the community and reflect the various distinctive groups in the population. Defendants are not entitled to a jury of any particular composition . . . .

*Id.* at 538, 95 S.Ct. at 701 (citations omitted). *Cf. State v. Garrett,* 627 S.W.2d 635, 638–39 (Mo. banc 1982). Appellant also seems to assert that the prosecutor's peremptory strikes systematically excluded this distinctive group. As appellant stated in his brief:

In *Blair,* the jury panel consisted of ninety-seven (97) members, 17 of whom were black, 12 of whom were excluded on the issue of sequestration and *Witherspoon.* This left five jurors, one of which was struck by the defense since he indicated he knew defendant from his days as a volunteer parole officer and the remaining four were struck by the prosecution. The all white jury which tried this case could hardly be said to mirror the white/black population of this county.

Appellant has failed to establish that the state has repeatedly, in case after case, utilized its peremptory challenges to exclude blacks from juries and has thereby failed to establish the systematic exclusion of blacks. *Swain v. Alabama,* 380 U.S. 202, 208, 85 S.Ct. 824, 829, 13 L.Ed.2d 759 (1965). *See also State v. Bradford,* 462 S.W.2d 664, 671 (Mo.1971); *State v. Ball,* 622 S.W.2d 285, 291 (Mo.App.1981). The point is overruled.

## VII

Appellant contends that the trial court erred in failing to grant a mistrial or other relief when state witness Ernest Jones invoked the fifth amendment which foreclosed the defense from cross-examining the witness on matters material to the prosecution's case, thereby violating appellant's right of confrontation under the sixth and fourteenth amendments to the United States Constitution.

In this case, appellant's defense was that Ernest Jones was the murderer. As part of that defense, appellant introduced testimony that the murder weapon was in the possession of Jones at the time of the victim's murder. The state had introduced the handgun, seized at the apartment where appellant was arrested, that was identified by ballistic experts as being the murder weapon. Thus, ownership, possession, and control of the weapon at the time of the murder was material to the state's case and appellant's defense. The alleged error centers on Jones's refusal to answer on cross-examination whether he had stolen the murder weapon five years previously from his neighbor.

A defendant in criminal proceedings has a sixth-amendment right to confront adverse witnesses. *Pointer v. Texas,* 380 U.S. 400, 403, 406–07, 85 S.Ct. 1065, 1067, 1069–70, 13 L.Ed.2d 923 (1965). And an essential interest secured by the right of confrontation is a defendant's right of cross-examination. *Bruton v. United States,* 391 U.S. 123, 126, 88 S.Ct. 1620, 1622, 20 L.Ed.2d 476 (1968); *Douglas v. Alabama,* 380 U.S. 415, 418, 85 S.Ct. 1074, 1076, 13 L.Ed.2d 934 (1965). Nevertheless, a state witness's invocation of his fifth-amendment right against self-incrimination during cross-examination does not *per se* violate a defendant's right to confront the witnesses against him and require striking of that testimony. As explained by this Court in *State v. Brown,* 549 S.W.2d 336 (Mo. banc 1977):

> In *5 Wigmore on Evidence,* sec. 1391, at 137 (Chadbourne Rev. 1974), the general applicable rule is stated as follows: "Where the witness, after his examination in chief on the stand, has *refused* to submit to cross-examination, the opportunity of thus probing and testing his statements has substantially failed, and his direct testimony should be struck out. On the circumstances of the case, the refusal or evasion of answers to one or more questions only need not lead to this result."

*Id.* at 341. This Court then adopted the rule in *United States v. Cardillo,* 316 F.2d 606, 611 (2d Cir.), *cert. denied,* 375 U.S. 822, 84 S.Ct. 60, 11 L.Ed.2d 55 (1963), with reference to when it is necessary to strike the testimony of a witness or a portion thereof if he invokes the fifth amendment. The Court in *Brown* found:

> *Cardillo* distinguished questions which were proper cross-examination but collateral to the main inquiry such as those relating solely to the credibility of the witness *or to prior criminal activity of the witness* from questions directly relating to the participation of two of the defendants in the conspiracy for which they were being tried.... *Cardillo* pointed out that not every refusal to answer by a witness claiming his fifth-amendment

rights requires the striking of his testimony or a part thereof, and stated at 613: ". . . There would appear to be at least three categories to be considered. The first would be one in which the answer would have been so closely related to the commission of the crime that the entire testimony of the witness should be stricken. The second would be a situation in which the subject matter of the testimony was connected solely with one phase of the case in which event a partial striking might suffice. The third would involve collateral matters or cumulative testimony concerning credibility which would not require a direction to strike and which could be handled (in a jury case) by the judge's charge if questions as to the weight to be ascribed to such testimony arose. As to the first and second categories suggested, whether all or a part of the testimony should be stricken, must depend upon the discretion of the trial judge exercised in the light of the particular circumstances."

. . . . .

It is seen from *Cardillo* and cases cited therein that courts must be acutely aware of a defendant's right to confront and cross-examine prosecution witnesses and to not permit that right to be diminished by recalcitrant witnesses who give damaging testimony on direct and then *refuse to answer questions on cross which are closely related to the commission of the crime* because those rights are constitutionally protected.

549 S.W.2d at 342–43 (emphasis added).

In the instant case, it is clear that appellant was not denied the right of cross-examination as to the possession of the murder weapon. Jones refused to answer only a single question relating to whether he might have possessed the gun *five years earlier,* and all other questions about the gun were answered. The subject matter about possession of the gun was thoroughly covered on cross-examination. The single question was not "closely related to the commission of the crime" for which appel-

lant was on trial or probative of possession of the weapon at the time of the murder. Jones had not waived any rights and properly invoked his right against self-incrimination about a matter relating to his commission of a crime. On these facts the Court holds that appellant was not prejudiced by the refusal of the witness to answer this singular question. The point is overruled.

## VIII

■ Appellant's next assignment of error is that he was denied his sixth and fourteenth amendment rights to a fair trial and effective assistance of counsel because his former attorney, who represented appellant in a guilty plea which was offered by the state as proof of an aggravating circumstance, appeared and advised state's witness Ernest Jones to invoke the fifth amendment and refuse to answer questions during cross-examination. In essence, appellant contends that the representation of Jones by Mr. Sterling, a Jackson County public defender who had represented appellant on unrelated charges three and one-half years earlier, was a conflict of interest resulting in prejudice to appellant.

In January 1977, Sterling represented appellant when he pleaded guilty to attempted second-degree burglary and assault with intent to rob with malice. In September 1980, Sterling was appointed to represent Ernest Jones in connection with charges of first-degree assault and possession of a controlled substance, charges totally unrelated to the capital murder at issue. At the time of appellant's capital murder trial, the charges against Jones were still pending and Sterling appeared in court to represent Jones when he testified as a witness. Appellant objected to Mr. Sterling's appearance as a "conflict of interest", contending that (1) because Sterling had previously represented appellant, he should not advise Jones of his self-incrimination rights; (2) the defense intended to call another member of the public defender's office as a defense witness; and (3) the defense might wish to call Mr. Sterling as a defense wit-

ness "to explain the circumstances surrounding Mr. Blair's former conviction if the state offers it in aggravation". The trial court appointed a second attorney to represent Jones for purpose of his testimony at appellant's trial. Mr. Sterling continued to represent Jones as to his pending assault and drug possession charges and remained in the courtroom. During Jones's cross-examination, Sterling twice advised his client not to answer. Appellant made no other objection to Sterling's representation until the day after Jones had completed his testimony, when he requested and was denied a mistrial on the conflict-of-interest grounds.

This is not a case where Jones and appellant were codefendants and Mr. Sterling represented both of them, where Sterling represented appellant in the murder prosecution and Jones as a state's witness in the case, or where Sterling represented appellant in the first case and prosecuted him in the second. Cf. *Holloway v. Arkansas*, 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978); *State v. Boyd*, 560 S.W.2d 296 (Mo. App.1977); *State v. Johnson*, 549 S.W.2d 348 (Mo.App.1977). During the trial Sterling represented only one client and one interest. His only duty was to protect the rights of Ernest Jones when he testified. Sterling did not represent the interests of appellant in the capital murder trial—his prior representation of appellant was totally unrelated to the capital murder trial. Even the charges for which he represented Jones were unrelated to the capital murder case. The Court holds that under these facts there was no conflict of interest or even an appearance of one. What appellant would have this Court find is that if an attorney represented a client in one case, the attorney would be forever barred from representing another person who might testify in a future, totally unrelated case against the former client. This the Court declines to do. The point is denied.

## IX

■ In a related assignment of error, appellant argues that he was prevented

from introducing mitigating evidence in the punishment phase of his trial in violation of the sixth, eighth, and fourteenth amendments to the United States Constitution. His contention is twofold. First, appellant alleges that the trial court improperly submitted his prior convictions—attempted second-degree burglary and assault with intent to rob with malice—as an aggravating circumstance because it was not authorized by § 565.012.2 as evidence of "a person who has a substantial history of serious assaultive criminal convictions." Second, appellant argues that he was precluded from remedying this error by presenting evidence in mitigation because his former attorney, who had represented state's witness Ernest Jones, was prevented from explaining the circumstances surrounding the convictions.

With respect to appellant's first argument, the trial court did not instruct the jury on the aggravating circumstance that "the offense was committed by a person who has a substantial history of serious assaultive criminal convictions". § 565.012.2(1). Nor was the circumstance of the prior convictions submitted as one of the "threshold" statutory aggravating circumstances which the jury had to find beyond a reasonable doubt *before* considering whether the death penalty was warranted "considering all the evidence". *See State v. Shaw,* 636 S.W.2d 667 (Mo. banc 1982). The "record of any prior criminal convictions and pleas of guilty", § 565.006.2, was submitted as an aggravating circumstance that the jury would have to find beyond a reasonable doubt when considering whether the imposition of death was warranted. Such a submission was an "aggravating circumstance otherwise authorized by law", § 565.012.1(3), and the judge "shall include [it] in his instructions to the jury". § 565.012.1. *See State v. Bolder,* 635 S.W.2d 673, 683 (Mo. banc 1982); MAI–CR2d 15.42, Note on Use 3. Nevertheless, this "aggravating circumstance" was not found by the jury and any possible error, of which there is none, would be harmless. *State v. Baker,* 636 S.W.2d 902, 907 (Mo. banc 1982).

Appellant also alleges that he was precluded from calling Sterling to testify about the circumstances surrounding appellant's two prior convictions because of Sterling's "conflict of interest" and because the judge ruled his testimony inadmissible. It should be noted initially that the judge never ruled that the evidence was inadmissible and that appellant could not call Sterling as a witness. While the trial court expressed doubts that such testimony would be admissible as retrying the prior convictions, it was unnecessary for the court to address the relevancy of the testimony until the witness was called. The only matter directly before the court was appellant's motion to direct a sentence of life imprisonment and objection to submit punishment to the jury because Sterling could not be called as a defense witness—a motion and objection the trial court denied. Nor was appellant prevented from calling Sterling as a witness because of a conflict of interest. *See* point VIII *supra.* Sterling, at the time, only represented Ernest Jones and did not at that time or ever represent the interests of appellant in the capital murder case. In addition, since Jones was not a party to the case and Sterling's anticipated testimony had no bearing on the pending charges against Jones, there was no conflict with his current representation that would have prevented him from testifying. Instead, as revealed by appellant's brief, the decision not to call Sterling was a matter of trial strategy at the punishment phase.

In his brief, appellant contends:

Had the Court properly discharged this Counsel as requested by defendant's lawyers the defendant would not have been as concerned about the jury's opinion of their calling former Counsel Sterling as a witness in mitigation of the State's aggravating circumstance as alleged in Instruction # 7 ... Defendant's position is that the jury could not separate the legalistics of what happened in the courtroom with respect to Mr. Sterling advising Witness Jones to take the Fifth Amendment and would speculate that

Witness Jones' answers could not only be prejudicial to himself but also to defendant Blair.

That decision of defense counsel cannot be attacked on appeal. The point is overruled.

## X

Appellant complains that the evidence of his arrest on an unrelated murder and the fact he had been in the penitentiary for other crimes was evidence that the jury was instructed it could consider in its decision on punishment.

The evidence of appellant's prior convictions was properly before the jury during the punishment phase. *See* point IX *supra.* With respect to appellant's arrest for an unrelated murder, the only evidence of that fact before the jury was contained in appellant's confessions [4] which were introduced during the guilt phase of the trial.[5] In essence appellant argues that because the jury was instructed that it could "consider all of the evidence relating to the murder of Kathy Jo Allen" in deciding on the appropriate punishment, that the jury considered the arrest of appellant on an unrelated murder charge which was improperly introduced during the guilt portion of the trial.

Prior to the admission into evidence of the confessions, there was a discussion between counsel and the court as to whether the reference to the arrest was admissible. In holding that the whole confession was admissible, the court noted that the references to the arrest and time in the penitentiary were part of appellant's bragging to the police about his reputation and were relevant to his intent and motive, and related to the voluntariness of the statement because they indicated his state of mind at the time he gave the confessions, *i.e.,* his confessions were not coerced by threats.

On matters of relevancy and materiality, the trial court has broad discretion and its decision should be overturned only if it abused that discretion. *State v. Wickizer,* 583 S.W.2d 519, 524 (Mo. banc 1979). It cannot be said that the court abused its discretion. Evidence of an arrest is ordinarily not admissible. In this case, the arrest was not admissible for the purpose of showing the arrest nor as bearing on appellant's propensity to commit violent acts. It was, however, part of the confession and related to why he thought Jackson selected him. The statement of appellant was part of his bragging about his reputation and reveals a partial motive in killing the victim to maintain that reputation, especially when he believed that Jackson approached him about "taking care of the girl" because of his reputation and when he recounted the crime to Ernest Jones and showed friends various items he had taken during the crime. "[E]vidence of other crimes is competent to prove the specific crime charged when it tends to establish (1) motive . . . ." *State v. Wing,* 455 S.W.2d 457, 464 (Mo.1970), *cert. denied,* 400 U.S. 1009, 91 S.Ct. 566, 27 L.Ed.2d 621 (1971). *See also State v. Mitchell,* 491 S.W.2d 292, 295 (Mo. banc 1973).

## XI

This Court is required to review the sentence in capital murder cases when the death penalty is imposed. § 565.014.1. As required by statute:

With regard to the sentence, the supreme court shall determine:

(1) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; and

---

4. The disputed portion of the confessions was as follows:

I was released from the Missouri State Penitentiary on October 20, 1978. On July 19, of this year, I went into the Jackson County Jail for murder first. In the penitentiary I had the reputation of being able to hold my own and I wasn't afraid of anyone and I wasn't what they called a snitch.

5. Another reference to appellant's arrest for an unrelated murder was made by Ernest Jones during defense counsel's cross-examination of him at the guilt phase. Defense counsel objected. The trial court sustained the objection and instructed the jury to disregard the statement. The other reference occurred during appellant's cross-examination when he admitted the relevant passage was true.

(2) Whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in section 565.012; and

(3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

§ 565.014.3, RSMo 1978. Appellant's other contentions of legal error will be discussed in the context of this Court's statutory review of the punishment imposed.

■ The record contains no substantial evidence that the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor.

In the presentence hearing, only the state presented evidence which consisted of appellant's two prior convictions. The jury was instructed on four statutory aggravating circumstances:

1. The defendant, Walter Blair, murdered Kathy Jo Allen for the purpose of receiving money or anything of monetary value, [§ 565.012.2(4)];

2. The defendant, Walter Blair, as an agent or employee of Larry Jackson and at his direction, murdered Kathy Jo Allen, [§ 565.012.2(6)];

3. The murder of Kathy Jo Allen involved torture and depravity of mind and that as a result thereof it was outrageously and wantonly vile and inhuman, [§ 565.012.2(7)]; and

4. The murder of Kathy Jo Allen was committed for the purposes of interfering with a lawful custody in a place of lawful confinement of Larry Jackson, [§ 565.-012.2(10)].

The court also instructed the jury on these mitigating circumstances: "1. Whether the defendant has no significant history of prior criminal activity, [§ 565.012.3(1)]; and 2. the age of the defendant at the time of the offense [§ 565.012.3(7)]." The jury found beyond a reasonable doubt all four of the aggravating circumstances.

■ Appellant argues that the aggravating circumstances are facially invalid because they are unconstitutionally vague.

Appellant only discusses the facial invalidity of the third aggravating circumstance, § 565.012.2(7). The others are straightforward and easily understood. With respect to the third aggravating circumstance, its facial validity has been upheld repeatedly. *Gregg v. Georgia,* 428 U.S. 153, 201, 96 S.Ct. 2909, 2938, 49 L.Ed.2d 859 (1976); *State v. Newlon,* 627 S.W.2d 606, 621 (Mo. banc 1982); *State v. Mercer,* 618 S.W.2d 1, 10 n.4 (Mo. banc) (by implication), *cert. denied,* 454 U.S. 933, 102 S.Ct. 432, 70 L.Ed.2d 240 (1981). In accordance with these cases, we still find § 565.012.2(7) facially valid.

■ Appellant also contends that the evidence was insufficient to support each of the aggravating circumstances. From the evidence the jury could have found that appellant was approached by Larry Jackson in the Jackson County Jail. That appellant was offered $2,000, an amount later raised to $6,000, by Jackson to keep the girl from testifying, so that Jackson could avoid the rape charge. Appellant met with the Jackson family to make certain "the offer was for real". He kept the victim under surveillance and would have killed her and her boyfriend the night before the murder if he had had a gun. He stole a gun for the purpose of killing the victim. He made several statements to acquaintances that he was going to "take the girl out". He went to her apartment, abducted the victim, forced her to drive to a vacant lot, and then killed her. There is substantial evidence that appellant murdered the victim at the direction and as an agent of Jackson for the purpose of receiving money and to interfere with the lawful custody of Jackson on the rape charge.

Specifically, appellant argues that the evidence was insufficient to support a conclusion that "the murder of Kathy Jo Allen involved torture and depravity of mind and that as a result thereof it was outrageously and wantonly vile and inhuman", citing *Godfrey v. Georgia,* 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980).

*Godfrey,* however, rests on its unique facts. There, it was conceded defendant had not tortured the victims nor commit-

ted an aggravated battery upon them. Yet, the death sentence rested on the jury's finding that Godfrey's actions had been "outrageously or wantonly vile, horrible or inhuman in that (they) involved ... depravity of mind ...." The Court rejected such conclusion as unconstitutional, noting several facts: Godfrey's victims were family members who had caused him "extreme emotional trauma"; that in an emotional state, he had killed them instantaneously; shortly after the killing Godfrey acknowledged involvement and the heinous nature of his crime and further, Godfrey had no criminal record. On these facts Godfrey's actions were deemed not to reflect "a consciousness materially more 'depraved' than that of any other person guilty of murder." State v. Newlon, 627 S.W.2d at 621–22.

In the instant case, the facts are distinguishable from Godfrey. Kathy Jo Allen was the victim of a contract killing. It represents the ultimate in disregard for human life: the commission of murder purely for money. Appellant had thought about the killing for a long time. He stole a pistol for that purpose and had stalked the victim several days before the murder. Kathy Jo Allen had no quick death; she had substantial time to contemplate her fate. She was the subject of a terror campaign by telephone, of which appellant took part, to keep her from testifying in Jackson's rape trial. When appellant was in her apartment, Kathy "was crying. She was scared ...." She was then abducted from her apartment by appellant and forced to drive to a vacant lot. She repeatedly asked whether she was going to be killed. She somehow had her shirt removed. She was hit with a brick. She screamed and was shot twice at close range. Appellant, a convicted felon, recounted the murder to a friend, showed friends the items he had taken, and showed the Jackson family the victim's driver's license so that he could get paid. He demonstrated no remorse for his acts. The jury found appellant's acts outrageously or wantonly vile, horrible or inhuman and that the conduct resulted from appellant's depravity of mind. The evidence supports this finding.

This Court has compared the records of all capital cases in which the sentence was imposed after the effective date of our law, May 26, 1977. This Court has reviewed and affirmed five death sentences. State v. Baker, 636 S.W.2d 902 (Mo. banc 1982); State v. Shaw, 636 S.W.2d 667 (Mo. banc 1982); State v. Bolder, 635 S.W.2d 673 (Mo. banc 1982); State v. Newlon, 627 S.W.2d 606 (Mo. banc 1982); State v. Mercer, 618 S.W.2d 1 (Mo. banc), cert. denied, 454 U.S. 933, 102 S.Ct. 432, 70 L.Ed.2d 240 (1981). One death sentence was reversed because of its disproportionality. State v. McIlvoy, 629 S.W.2d 333 (Mo. banc 1982). In addition, this Court has affirmed the following capital cases in which the choice of death or life imprisonment without possibility of parole for fifty years was submitted to the jury: State v. Engleman, 634 S.W.2d 466 (Mo.1982) (car bombing); State v. Greathouse, 627 S.W.2d 592 (Mo.1982); State v. Bostic, 625 S.W.2d 128 (Mo.1981); State v. Thomas, 625 S.W.2d 115 (Mo.1981); State v. Emerson, 623 S.W.2d 252 (Mo.1981); State v. Turner, 623 S.W.2d 4 (Mo. banc 1981), cert. denied, —— U.S. ——, 102 S.Ct. 1982, 72 L.Ed.2d 448 (1982); State v. Jensen, 621 S.W.2d 263 (Mo.1981); State v. Baskerville, 616 S.W.2d 839 (Mo.1981); State v. Mitchell, 611 S.W.2d 223 (Mo. banc 1981); State v. Williams, 611 S.W.2d 26 (Mo. banc 1981); State v. Royal, 610 S.W.2d 946 (Mo. banc 1981); State v. Borden, 605 S.W.2d 88 (Mo. banc 1980); State v. Downs, 593 S.W.2d 535 (Mo.1980).

Our determination whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases is based on a comparison of all the above cited cases and the entire record of the instant case. In considering the crime and the appellant, we find the penalty imposed neither excessive nor disproportionate. As stated previously, the facts surrounding this case represent a cold, calculated murder in which the victim was intentionally made to suffer extreme pain. This case presents not just a contract killing, but a "murder for hire" to kill the victim of and sole witness to anoth-

er crime (rape) to prevent her from testifying. Such a murder strikes at the heart of the administration of justice. A free and peaceful society is directly dependent on a justice system where disputes between the state and a person or between two people are resolved in courts under rules of law and not by violence in the streets.

It is seldom that a person intentionally becomes a witness to an event. It most often occurs by the happenstance of just being there. But when a person is a witness, as the victim or otherwise, that person becomes indispensable to the administration of justice. All other participants can be replaced by others, whether they be lawyers, judges, or jurors, but the witness cannot be replaced by anyone. Nor is it possible to give protection to a witness without completely removing the person from his ordinary daily life and confining or isolating the witness in some secret place. And that, from a practical standpoint, is simply impossible. Parties's rights to summon witnesses in their behalf is constitutionally protected. In short, a witness is the only person who, as an individual, is singularly indispensable to the fair administration of justice. The interference with the appearance of necessary witnesses in court and the killing of a witness to prevent the witness from testifying, as here, is absolutely intolerable. From the public standpoint it cuts the very heart out of a justice system necessary to maintenance of freedom. It is difficult to conceive of a crime more inimical to our society than the killing of a witness to prevent the witness from testifying. Prospective offenders who might consider killing a witness must be deterred. Such a purpose is served by imposing the death penalty. See *Gregg v. Georgia,* 428 U.S. 153, 183, 96 S.Ct. 2909, 2929, 49 L.Ed.2d 859 (1976). The General Assembly has recognized this fact and has since enacted the following statutory aggravating circumstance: "The capital murder was committed by the defendant for the purpose of preventing the person killed from testifying in any judicial proceeding." § 565.012.2(12), RSMo Cum.Supp.1981. Considering the "crime", the death penalty is not excessive or disproportionate in this case.

While the crime in this case, as a contract killing, is similar to *State v. McIlvoy, supra,* the defendants are not. The circumstances surrounding this case fall far short of exhibiting any mitigating factors concerning the appellant. Appellant plotted a course to kill Kathy Jo Allen and carried out that plan by abducting her and killing her. On the day after he killed Kathy, appellant described the abduction and murder in detail to Ernest Jones and showed friends the loot obtained during the crime. He kept Kathy's driver's license until he had shown it to the Jackson family so he could be assured of getting paid. He boasted to police about his reputation of "being able to hold his own". No evidence exists that appellant was under the influence of drugs or alcohol at the time of the killing, or that he was of subnormal intelligence.

Under all the circumstances, the death penalty was neither excessive nor disproportionate, considering the crime and the appellant, to the punishment imposed in similar cases.

The judgment is affirmed.

DONNELLY, C. J., and RENDLEN, WELLIVER, MORGAN and HIGGINS, JJ., concur.

SEILER, J., dissents in separate dissenting opinion filed.

Execution date re-set for October 28, 1982.

SEILER, Judge, dissenting.

I respectfully dissent. The aggravating circumstance found by the jury that the murder was committed for the purpose of interfering with a lawful custody in place of lawful confinement of Larry Jackson is not supported by the evidence. The killing of the victim did not in any way affect or change the lawful custody of Larry Jackson, who was in jail on various charges, including murder and robbery of one Jerry W. Han, as well as alleged rape of Miss Allen. See *State v. Jackson,* 608 S.W.2d 420 (Mo.1980). In my opinion the aggravating circumstance of interfering with lawful

custody refers to interfering with present custody. The meaning of lawful custody is discussed at some length in *State v. Trimble*, 638 S.W.2d 726 (Mo. banc 1982), from which it is apparent that the custody under examination is present custody, not a future possibility. The only way that the killing of Miss Allen could have borne on the custody of Larry Jackson would be as to how it would affect the outcome of some future trial of Jackson for her alleged rape, and there is no way that can be determined at this point or at the time of the trial of defendant. Jackson could have been convicted of her rape even though she were dead. There may have been a witness, or defendant may have confessed, or circumstantial evidence might be sufficient. On the other hand, Jackson might have been acquitted. We have no way of knowing, nor did the jury, whether Jackson's rape trial would have resulted in his being in lawful custody as a consequence thereof or not.

Jackson unquestionably was in lawful custody at the time Miss Allen was killed, *Trimble, supra,* and this was not changed or interfered with by her death.

The question of whether a death penalty can be upheld when one or more of the aggravating circumstances found by the jury is not in fact present remains to be seen. In *Zant v. Stephens,* —— U.S. ——, 102 S.Ct. 1856, 72 L.Ed.2d 222 (1982), the court asked the Georgia Supreme Court to answer the question of what premises of state law support the conclusion that a death sentence is not impaired by the invalidity of one of the statutory aggravating circumstances found by the jury. The court sent the case back for answer to this certified question despite the argument of the Georgia attorney general that the aggravating circumstances are merely a threshold factual determination the jury must make. The difficulty is that there is no way to tell whether the jury relied on the invalid circumstance and, hence, no way to determine whether the imposition of the death penalty was arbitrary and capricious.

We do not know how the Georgia Supreme Court or the United States Supreme Court will decide on this; and, in the meantime, we should not assume that invalidity of an aggravating circumstance found by the jury will be held to be immaterial.