STATE of Missouri, Respondent,

v.

Anthony Joe LaRETTE, Jr., Appellant.

No. 63569.

Supreme Court of Missouri,
En Banc.

March 29, 1983.

Rehearing Denied April 26, 1983.

amendment was necessary. *Id.* at 601–02.

Donald C. Tiemeyer, St. Charles, for appellant.

John Ashcroft, Atty. Gen., Kelly Klopfenstein, Asst. Atty. Gen., Jefferson City, for respondent.

BILLINGS, Judge.

Defendant Anthony J. LaRette, Jr., was sentenced to death for the capital murder of 18-year-old Mary Fleming. In this appeal he contends he was denied his statutory right to a speedy trial; the evidence was insufficient for the jury to find torture as an aggravating circumstance; torture or depravity of mind as aggravating circumstances gives the jury a roving commission to return the death penalty; Missouri's death penalty statutes are unconstitutional; the evidence fell short of demonstrating deliberation and premeditation; the death penalty is excessive and disproportionate in this case; and, the trial court erred in certain evidentiary rulings. We affirm.

■ In our determination of whether there was sufficient substantial evidence to support the guilty verdict of capital murder, we consider the facts in evidence and all favorable inferences reasonably to be drawn therefrom in the light most favorable to the State and disregard all contrary evidence and inferences. *State v. Franco,* 544 S.W.2d 533 (Mo. banc 1977), *cert. denied,* 431 U.S. 957, 97 S.Ct. 2682, 53 L.Ed.2d 275 (1977).

Mary Fleming lived with her mother and sister in an apartment complex in St. Charles, Missouri. Her mother left for work about 6:30 a.m. the morning of July 25, 1980, and the sister left for work approximately thirty minutes later. The mother exited the apartment by the back door, locking it. The sister locked the front door when she left the apartment. Mary was still asleep.

A grocery store is located adjacent to the apartment complex and at 10:30 a.m. Mary, wearing a swimming suit bikini top and cutoff jeans, cashed a check and purchased groceries. She was seen walking towards her apartment a short time later. During this same time frame a cream-colored convertible automobile had been seen slowly circling the neighborhood. There was only

one individual in the convertible, a white man, the driver.

Sometime between 10:30 and 11:00 a.m. a friend of Mary Fleming, Mary Ellen Sommerville, telephoned the Fleming apartment. A strange male voice answered the telephone. Mary Ellen asked to speak to Mary. The male voice said she was not there and asked who was calling. The girl replied "Elly" and the male voice said he would have Mary call her back and hung up. Mary Ellen testified the male voice "was a high pitched voice because he seemed to be laughing or something, being in a good mood or maybe drinking or something." Because Mary Ellen had talked with Mary Fleming earlier that morning and did not know the voice that answered the telephone and "it was kind of weird," she immediately dialed the Fleming number again. There was no answer.

At approximately 11:00 a.m. a man, identified as defendant, was seen running from the direction of the apartment complex to a cream-colored convertible automobile which was parked on the grocery store parking lot. Defendant got into the vehicle and drove away. At about the same time a man and his wife who lived in another apartment complex behind and across a yard and street from the Fleming apartment saw Mary running towards their home. She was bloody and naked except for the bikini top which had been pulled up, exposing her breasts. She made it to the front door of the neighbors' apartment before she collapsed, bleeding profusely. Police and medical aid arrived shortly. Despite on-the-scene and hospital emergency medical efforts, Mary died shortly thereafter.

Death was attributed to the young blond girl having bled to death. Her throat had been cut from ear to ear by a sharp instrument and photographic exhibits graphically illustrate she was nearly decapitated. She had two stab wounds to the chest, one of which penetrated her lung, the second penetrating her heart. The second stab wound had passed through the heart, leaving the tip of a metal blade in her lung. Her forehead and right arm were bruised and she had numerous cuts, termed "defense wounds", to her fingers and hands.

An examination of the Fleming apartment quickly demonstrated it was the scene of the bloody slaying. In the front living room there was a pair of cutoff jeans on the floor, blood and hair on the walls, blood on the end and coffee tables, and a large puddle of blood in the middle of the floor. An unopened and blood splattered purse, containing money, was on a coffee table. In a hallway between the living room and kitchen was a trail of blood. Female panties, spotted with blood, were on the kitchen floor. The back door was blood smeared and there was a trail of blood across the back porch and steps. A burner on the kitchen stove was still on and a pot of water with eggs in it were on the burner. A partially completed green salad was on a kitchen counter.

For several days before July 25 defendant had been staying with Richard Roberson. On that Friday morning defendant was dressed in light trousers and a button shirt. He drove Roberson to work in Roberson's yellow Buick convertible and borrowed the car "to go on a job interview". Defendant picked Roberson up at 1:15 p.m. and at that time was dressed in a t-shirt and cutoff jeans. Roberson never again saw the clothing defendant was wearing Friday morning.

Two days later, Sunday, Roberson drove defendant to defendant's parents' home in Topeka, Kansas. As Roberson was leaving for the return trip, defendant said: "If you have any problems down there, call me and I'll take care of them." Roberson did not know what defendant was talking about.

By Tuesday, July 29, Roberson became concerned because of news articles which appeared to link his convertible with the killing. He called defendant in Topeka but defendant was reluctant to talk about the murder over the telephone. Further telephone calls elicited admissions from the defendant that he had killed the 18-year-old girl. Defendant said he first saw the girl when she was cashing a check at the gro-

cery store and he followed her back to her apartment. He said he had thrown the murder weapon, a stilleto-type lock blade knife, in the river. He told Roberson that he went into the Fleming apartment for the purpose of burglarizing it and the victim walked in on him. He said he struck the girl and knocked her down; that he had stabbed her; and, cut her throat as she attempted to run away from him. Although he had earlier told Roberson he did not know why he had killed the girl, he later said she started yelling and tried to run. At the time of one of the telephone conversations a police officer at Roberson's residence listened on an extension telephone and heard the defendant say the knife he used was in the river and he planned to stay away from his parents' home for thirty days until "the heat was off."

St. Charles detectives first questioned defendant about the murder early in the morning of August 7, 1980, in the Shawnee County jail in Topeka, Kansas, after first giving him *Miranda*[1] warnings and having him initial and sign a printed form which explained his constitutional rights. When he was asked about his involvement in the crime he put his hands over his eyes and said: "I'm responsible for her death." In this interview he told the officers he had picked up a hitchhiker near Roberson's house and the hitchhiker asked him if he would take him to the house of a girl who owed him some money. He said he drove the hitchhiker to a grocery store parking lot and parked at the edge of the lot next to some apartments. The hitchhiker got out of the car and went into one of the apartments. After waiting about 15 minutes he got worried about the hitchhiker and went to the front door of the apartment and looked inside. He said the hitchhiker was either standing or bending over a girl. The girl was covered with blood. The hitchhiker was stabbing her while she was pleading for her life. He said the hitchhiker ran out of the front door of the apartment when he entered it. He told the officers the girl's throat was cut but he wasn't worried about

that too much because she wasn't gurgling, but was worried about the stab wounds to her chest and tried to apply direct pressure to her chest to stop the bleeding. The girl started fighting him and broke away and ran out the back door. He had her blood all over his hands, was scared, and ran out the front door.

Later that morning at the Shawnee County jail, a deputy sheriff was advising defendant of his extradition rights. During the course of this procedure the defendant exclaimed: "I tried to choke her first but I couldn't. She promised not to scream, but she lied to me. I caused an 18-year-old to die."

Defendant was returned to St. Charles that day and interviewed again that evening. He was again advised of his constitutional rights and signed another written waiver. He told the officers he took the hitchhiker to the girl's apartment but said that when he went to find the hitchhiker he saw him either kneeling or laying on the girl; that the hitchhiker's pants were pulled down and his buttocks exposed, and there was blood all over the girl. In this version he told the officers the hitchhiker ran out the back door of the apartment. When the officers related what witnesses had told them about the convertible circling the neighborhood and neighbors had seen only Mary Fleming exiting via the back door, defendant began crying and admitted there was no hitchhiker and said "I did it."

Defendant then told the officers he entered the Fleming apartment by means of an unlocked rear door to burglarize the apartment. He first went downstairs and then came back up the stairs and the victim was standing in her living room and had already removed her shorts. He had the knife in his hand and grabbed her and told her he did not want to hurt her, "not to scream, that all he wanted to do was get the hell out of there." He said the girl agreed not to scream and he let her go. He said she started to scream and "[T]hat is when it happened. She lied to me. She promised me she wouldn't scream." De-

1. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct.     1602, 16 L.Ed.2d 694 (1966).

fendant said she was just like "... all the others. My wife and my mother-in-law always lied to me. If she hadn't lied to me it wouldn't have happened." Defendant then told the officers he did not remember what happened after the girl started screaming and that he left by the front door and went to Roberson's car.

At trial defendant presented evidence but did not testify.

Defendant was arraigned on November 21, 1980, in the Circuit Court of St. Charles County and trial commenced in the Warren County Circuit Court on August 11, 1981. He contends he was denied his statutory right to a speedy trial under § 545.780, RSMo 1978.

At the time of defendant's arraignment, the parties consented that the case be continued until December for the setting of various motions. On January 7, 1981, defendant filed a motion to dismiss or in the alternative to compel the State to elect to proceed on one of the alternative charges [capital murder and/or murder in the first degree] and this was followed by defendant's motion for a change of venue on January 14, 1981. The case was lodged in Warren County on January 27, 1981, and set for trial on May 28, 1981. On April 20, 1981, defendant filed a motion to remove the case from the trial docket because the transcript of his preliminary hearing had not been completed, nor had the transcript of a deposed witness. The State consented to the motion and the court, treating it as one for continuance, found "[T]he ends of justice served by the granting of such continuance outweighs the best interests of the public and the defendant in a speedy trial" and found that the transcript of the preliminary hearing had not been made available to the defendant and further discovery might be necessary upon the transcript being completed. The case was reset for June 11, 1981. On June 3, 1981, the State filed a motion to continue the case because the transcript, being prepared from tape re-

cordings by the State Court Administrator's Office, had not yet been completed. On the same date the court entered an order continuing the case to August 11, 1981, the order reciting the continuance was for the same reasons as set forth in the formal order of April 20, 1981.

■ Section 545.780, RSMo 1978, expressly excludes periods of delay resulting from hearings on pretrial motions, resulting from a change of venue, and continuances based upon findings by the trial court that the ends of justice served by taking such action outweigh the benefits of a speedy trial. Here, the delays in bringing the defendant to trial within the statutory 180 days were attributable to delays occasioned by pre-trial motions, change of venue, and continuances because of the preparation of the preliminary hearing transcript. The defendant has failed to sustain his burden that the failure to bring him to trial within the statutory period was occasioned by the State. *State v. Franco,* 625 S.W.2d 596 (Mo.1981); *State v. Newberry,* 605 S.W.2d 117 (Mo.1980).

Defendant avers there was insufficient evidence for the jury to find torture as an aggravating circumstance. He notes that under § 565.012, RSMo 1980 Supp., the death penalty cannot be imposed unless one of the statutory aggravating circumstances in that section is found by the jury. The particular subparagraph of § 565.012.2(7), which is applicable to this case provides:

The offense was outrageously or wantonly vile, horrible or inhuman in that it involved torture, or depravity of mind.

In this case the jury, in imposing the death sentence, found the offense was outrageously or wantonly vile, horrible or inhuman because defendant's acts involved *both* torture and depravity.[2]

■ We believe the evidence surrounding the brutal, heinous, and senseless slaying of the 18-year-old victim in this case fully warranted the jury to find *both* aggravating

---

**2.** The jury also found the non-statutory aggravating circumstance that defendant had been

convicted of rape in Kansas in 1974.

circumstances. It is obvious that Mary Fleming had ample opportunity to anticipate her death and her slaughter-type killing supports the further finding of depravity of mind. Her body bore mute and stark evidence of the serious physical abuse and pain and suffering she endured in her futile struggle for life. The photographic exhibits, as well as the medical testimony, demonstrate the bruising of her head and arm, the cuts or defense wounds to her hands and fingers, the stab wounds to her chest and the near decapitation by reason of her throat having been cut from ear to ear. These matters and the physical evidence in the apartment suggest she was pursued from one end of the apartment to the other as defendant struck, stabbed and slashed her. A large pool of blood and her cutoff jeans were on the living room floor. Blood and hair were on the living room wall and blood was splattered over various articles of furniture in that room. There was blood on the doorway between the living room and kitchen, as well as on the floor of the hallway. Female panties, blood splattered, were on the kitchen floor. The trail of blood was evident on the rear door, across the porch, and down the steps as the girl, practically naked, made her way across the street to the neighbor's front door.

■ The State suggests the jury could have well concluded that defendant was describing what actually transpired when he told the officers the phantom hitchhiker was kneeling or laying on the girl with his pants down and she was pleading for her life as she was being repeatedly stabbed. Aside from this, we are of the opinion the evidence was sufficient and substantial to support the finding of both statutory aggravating circumstances. Mary Fleming had no quick death and had substantial time to contemplate her fate. *State v. Blair,* 638 S.W.2d 739 (Mo. banc 1982). Furthermore, as noted in *State v. Mercer,* 618 S.W.2d 1, 10 (Mo. banc 1981), where two or more statutory aggravating circumstances

are found by the jury, the failure of one circumstances does not taint the proceedings so as to invalidate the other aggravating circumstance found and the sentence of death thereon. Having found the threshold requirements of statutory aggravating circumstances, the jury could also consider the defendant's prior convictions [3], including rape, together with all of the evidence adduced at trial, in imposing the death sentence. *State v. Stokes,* 638 S.W.2d 715 (Mo. banc 1982).

Defendant's contention that § 565.012.-2(7), RSMo 1980 Supp., is facially violative of the United States and Missouri Constitutions has been expressly considered and rejected by this Court. *State v. Newlon,* 627 S.W.2d 606 (Mo. banc 1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 185, 74 L.Ed.2d 149 (1982). *Newlon* and *State v. Bolder,* 635 S.W.2d 673 (Mo. banc 1982), likewise rejected defendant's further contention that Missouri's death penalty fails to measure up to constitutional standards.

■ Defendant next contends the evidence was insufficient to demonstrate the elements of deliberation and premeditation necessary for capital murder. In *State v. Craig,* 642 S.W.2d 98, 101 (Mo. banc 1982), we said:

There need not be direct evidence of premeditation and deliberation to support a capital murder conviction; indirect evidence and inferences reasonably drawn from circumstances surrounding the murder are sufficient. *State v. Turner,* 623 S.W.2d 4, 7 (Mo. banc 1981). Premeditation is present if the accused reflects on his act for any length of time prior to the act. Deliberation is found when an act is performed with a cool and deliberate state of mind. *Id.* at 7; *State v. Strickland,* 609 S.W.2d 392, 394 (Mo. banc 1980).

The jury could reasonably find that defendant, armed with a sharp, stiletto type lock-blade knife, drove slowly around the

---

**3.** In addition to defendant's 1974 rape conviction the evidence in the punishment phase of the trial showed prior convictions for burglary, theft and pocket picking. Section 565.006.2, RSMo 1978. *See: State v. Blair,* 638 S.W.2d 739, 756 (Mo. banc 1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 838, 74 L.Ed.2d 1030 (1983).

neighborhood where the victim's apartment was located looking for a female target; that upon seeing the young and attractive girl, attired in cutoff jeans and a bikini top, he admittedly followed her to her apartment for the express purpose of committing a crime; that the jury could reasonably find, contrary to his hitchhiker and burglary versions, that he entered the apartment for the purpose of sexually assaulting the girl. Such an inference can be drawn from the physical facts observed in the apartment. The obvious struggle in the living room where her shorts were found. The bloody trail to the kitchen where her panties were on the floor. The bikini top pulled up, exposing her breasts. Defendant said the victim lied to him because she promised him she would not scream and because she did scream he did "it". This statement, in itself, demonstrates defendant deliberated his action prior to stabbing, cutting and killing Mary Fleming.

A killing through the use of a deadly weapon on a vital part of the body of the victim is sufficient to permit a finding of intent to kill. *Strickland, supra,* at 394. The jury could have found from the number and serious nature of the knife wounds that defendant was practically certain to cause Mary Fleming's death. And, the previously demonstrated intent to kill provided deliberation. *State v. Bolder, supra* at 673.

On the record before us, the jury could reasonably find defendant intended to take the life of the girl and acted with the necessary premeditation and deliberation.

Defendant's complaint regarding the admission of the testimony of the Shawnee County Deputy Sheriff because this officer had not given him *Miranda* warnings prior to interrogating him is totally without merit. Contrary to defendant's unsupported assertion, the evidence clearly shows there was no interrogation of defendant by the Kansas officer concerning the killing of Mary Fleming.

Aside from the fact defendant had previously been given *Miranda* warnings and signed a waiver, the uncontradicted evidence was that during the course of the deputy's advising defendant of his rights with regard to extradition, defendant spontaneously volunteered: "I tried to choke her first, but I couldn't . . . . She promised not to scream, but she lied to me . . . . I caused an 18-year-old girl to die."

There being no interrogation of defendant by the deputy sheriff when defendant made the incriminating statement and the statement being unsolicited and volunteered, it was properly admitted. *Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980); *State v. O'Toole,* 619 S.W.2d 804 (Mo.App.1981).

The trial court properly excluded defendant's proffered evidence regarding obscene telephone calls received by Mary Fleming during the year prior to her slaying. Disconnected and remote acts, outside the crime itself, cannot be separately proved for the purpose of pointing up someone other than the accused; and evidence which can have no other effect other than to cast a *bare* suspicion on another, or to raise a conjectural inference as to the commission of the crime by another is not admissible. 22A C.J.S. Criminal Law § 622b at 451; *State v. Stokes,* 638 S.W.2d 715 (Mo. banc 1982); *State v. Umfrees,* 433 S.W.2d 284 (Mo. banc 1968). Defendant's suggestion that the person responsible for the obscene telephone calls may have been the killer ignores defendant's multiple admissions that he choked, struck, slashed and stabbed Mary Fleming.

Defendant's assignment of error in the admission of the cutoff shorts, panties, and shoes because the evidence did not establish they belonged to the victim is denied. Demonstrative evidence is admissible if it throws any relevant light upon a material matter in issue. *State v. Bolder, supra,* at 688. Articles, instruments and weapons that have a tendency to explain the manner in which a crime is committed that are found at or near the scene of the crime are generally admissible. *State v. Neal,* 591 S.W.2d 178 (Mo.App.1979). Such evidence is usually held admissible if it tends to connect the defendant with the

crime, prove the identity of the deceased, shows the nature of any wounds, or throws any relevant light upon any material matter in issue. *State v. Williams*, 606 S.W.2d 254 (Mo.App.1980). Mary was wearing cutoff jeans when defendant followed her to her apartment. The articles of clothing, their condition, and location within the apartment support the State's theory that defendant was pursuing his victim and removing her clothing as he was attacking her with his knife.

Defendant levels a double-barreled attack on the trial court's admitting his statements to the St. Charles police officers who first questioned him in Topeka and later at St. Charles. He first claims the statements were constitutionally infirm because he had been deprived of sleep, food and drink, and his physical and mental condition; secondly, his request to return to his cell in Topeka because he was tired and hurting, was an assertion of his right to remain silent and the subsequent questioning at St. Charles violated this right.

Out of the hearing of the jury, an evidentiary hearing was conducted on the voluntary nature of defendant's statements. Defendant did not testify but the court heard the testimony of the St. Charles officers, the stipulated testimony of a Topeka medical doctor, and had before it the waiver forms executed by the defendant.

As a result of self-inflicted superficial wounds and cuts, defendant was treated in the emergency room of a Topeka hospital late in the afternoon of August 6. He remained at the hospital until shortly after midnight and was taken by Kansas officers to the Shawnee County jail. St. Charles detectives went to the jail at about 3:00 a.m. and asked defendant if he felt up to talking to them about a homicide in St. Charles on July 25. Defendant replied "yes" and asked for and received a cigarette. *Miranda* warnings were given and defendant signed a "Constitutional Rights" waiver form. After defendant had related his first version of the hitchhiker being the killer, he told the detectives "I'm tired and I'm hurting and I would like to go back to my cell." No further questions were asked and defendant was returned to his cell. The interview had lasted approximately thirty minutes.

The St. Charles officers picked defendant up at the jail between 10:30 and 11:00 that morning for the return trip to St. Charles. On the trip the defendant slept most of the five to six hours it took to drive from Topeka to St. Charles. Enroute the defendant requested and was given a soda. Defendant was lodged in the St. Charles jail and at some point prior to his second questioning by the detectives he was given a hamburger and coffee. The second interview commenced about 7:40 p.m. and before defendant was questioned he was again given the *Miranda* warnings and signed a waiver form. At no time did the defendant indicate he did not want to talk to the officers, nor did he complain of being tired, hungry, thirsty or in pain. The trial judge found and determined that both statements of the defendant were voluntarily given. The jury was also instructed concerning the issue of voluntariness and told to disregard them if they found the statements were made involuntarily.

■ The record shows that defendant was given the warnings required by *Miranda* on the two occasions he was interviewed by the St. Charles detectives and that he understandingly declined to exercise his right to remain silent. *State v. Hughes*, 596 S.W.2d 723 (Mo. banc 1980). As stated in *Hughes, supra*, at 726–27:

> When a criminal defendant alleges that his inculpatory statements, made while he was held in custody, are not admissible because involuntarily made, the state must bear the burden of proving the voluntariness of the confessions. *Miranda v. Arizona*, 384 U.S. 436, 479, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694 (1966). A confession is admissible if the state proves by a preponderance of the evidence that it was voluntary. *Lego v. Twomey*, 404 U.S. 477, 482–87, 92 S.Ct. 619, 623–25, 30 L.Ed.2d 618 (1972); *State v. Olds*, 569 S.W.2d 745, 751–52 (Mo. banc 1978). The state must show that 'defendant was ef-

fectively advised of his rights and he then intelligently and understandingly declined to exercise them.' *State v. Alewine,* 474 S.W.2d 848, 851 (Mo.1971).

The determination of the voluntariness of a statement is made in the first instance by the trial court. The trial court must determine the credibility of witnesses, and where evidence is in conflict, make factual findings. On appeal, the question is 'whether the evidence was sufficient to sustain the trial court's finding that the statement was voluntarily given.' *Alewine,* 474 S.W.2d at 852.

We find there was sufficient evidence to support the trial court's determination that defendant's statements were voluntary, and to support a jury finding the defendant made the statements freely and voluntarily.

The trial court did not abuse its discretion in admitting photographs of the victim's hands, portraying the "defense wounds". Defendant avers that the coroner's identification of the photographs as pictures of Mary's hands was based upon only an identification bracelet which had been placed on her wrist by medical authorities.

A series of colored photographs of Mary Fleming's bloody and mutilated body were taken by police and received as exhibits. The coroner had been advised of the victim's name and after his examination filled out the official death certificate. A comparison of the photographic exhibits clearly show the hands depicted in exhibits 49 and 50 were a part of the series of photographs of the body of the slain girl.

The trial court is vested with broad discretion in the admission of photographic evidence. *State v. Weekley,* 621 S.W.2d 256 (Mo.1981); *State v. Goodman,* 608 S.W.2d 498 (Mo.App.1980); *State v. Hines,* 581 S.W.2d 109 (Mo.App.1979). Here, the coroner had testified as to the nature of the cuts to Mary's hands before he identified the questioned photographs. We find no error.

Defendant's final point of alleged trial error is novel but without legal sup-port. He contends: "The trial court violated the defendant's right to due process of law when it admitted photographs of an alleged get-away vehicle because the display of vehicles used by investigation officers was unduly suggestive in that the witnesses were allowed to choose between only two photographs."

Defendant suggests we expand the constitutional safeguards surrounding the identification of criminal *defendants [Simmons v. United States,* 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968)] to automobiles. We decline to do so and find no error.

We turn now to defendant's contention that the sentence of death in this case is excessive and disproportionate.

The General Assembly has mandated that this Court shall consider the matter of the death sentence being imposed and requires us to determine (§ 565.014.3, RSMo 1978):

(1) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; and

(2) Whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in section 565.012; and

(3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

We find nothing in the record to suggest the sentence resulted from the influence of passion, prejudice, or any other arbitrary factor. There was substantial evidence to support the jury's finding of statutory aggravating circumstances. We conclude that considering the instant crime and the defendant in this case that the penalty imposed is not excessive nor disproportionate to the penalty imposed in similar cases. *State v. Stokes,* 638 S.W.2d 715 (Mo. banc 1982).

The judgment is affirmed.

RENDLEN, C.J., and HIGGINS, GUNN and DONNELLY, JJ., concur.

WELLIVER, J., concurs in result in separate opinion filed.

ROBERT E. SEILER, Senior Judge, concurs in part and dissents in part in separate opinion filed.

BLACKMAR, J., not participating because not a member of the Court at the time the cause was submitted.

Execution date set for May 13, 1983.

WELLIVER, Judge, concurring in result.

I concur in most of the principal opinion's reasoning and in its result. I am unable, however, to concur except as to the result in that part of the principal opinion that addresses appellant's argument that the evidence was insufficient to support the jury's finding of the statutory aggravating circumstance.

The death penalty may not be imposed unless the jury finds beyond a reasonable doubt one of the twelve statutory aggravating circumstances. § 565.012(4)–(5), RSMo Supp. 1982.[1] Those aggravating circumstances are enumerated in § 565.012(2). In this case the trial court instructed the jury on only one aggravating circumstance: that the murder "involved torture or depravity of mind and that as a result thereof it was outrageously or wantonly vile, horrible or inhuman." That instruction was taken from § 565.012(2)(7), which provides as a statutory aggravating circumstance that "[t]he offense was outrageously or wantonly vile, horrible or inhuman in that it involved torture, or depravity of mind." Appellant makes no argument regarding the fact that the trial court inverted the language of the statute, but in any event I do not believe that fact has any bearing upon this case. The jury found as a statutory aggravating circumstance that the murder involved "[t]orture, depravity of mind and that as a result it was outrageous and wantonly vile, horrible and inhuman." Appellant's argument is unclear, but it appears to be that the evidence was insufficient to support a finding of torture and that because the jury did not find "torture or depravity of mind" in the disjunctive language of the statute the lack of evidentiary support vitiates the finding of the statutory aggravating circumstance.

I agree with the principal opinion that appellant's argument is without merit, but I reach that conclusion for a different reason. Neither torture nor depravity of mind constitutes the aggravating circumstance. The aggravating circumstance is that the murder is "outrageously or wantonly vile, horrible or inhuman." The murder possesses that quality, the statute says, *because* it involves torture or depravity of mind. Thus, a finding of at least one—either torture or depravity of mind—is prerequisite to a finding of the aggravating circumstance. Here the jury found the aggravating circumstance. That it so found because it apparently thought the murder involved both torture and depravity of mind is inconsequential. I agree with the principal opinion that the evidence supports a finding of both, but only a finding of one or the other was necessary to a finding of the aggravating circumstance. There was no error.

I disagree with the principal opinion for two related reasons. First, it characterizes § 565.012(2)(7) as comprising two statutory aggravating circumstances rather than one. According to the principal opinion, torture and depravity of mind constitute separate aggravating circumstances. I believe, as demonstrated above, that the statutory language itself forecloses that reading. Second, having made that characterization, the principal opinion states that the evidence was sufficient to support a finding of "both statutory aggravating circumstances," and then it goes on to conclude that in any event "where two or more statutory aggravating circumstances are found by the jury, the failure of one circumstance does not taint the proceedings so as to invalidate the other aggravating circumstance found and the sentence of death thereon." I think this latter statement is both unnecessary and unwise.

The question whether the failure of one statutory aggravating circumstance found by the jury vitiates the death sentence is not present in this case. It is, however, pending before the United States Supreme Court. *See Zant v. Stephens,* 456 U.S.

1. All statutory references are to RSMo Supp. 1982.

410, 102 S.Ct. 1856, 72 L.Ed.2d 222 (1982). In *Zant* the Supreme Court certified to the Georgia Supreme Court the following question: "What are the premises of state law that support the conclusion that the death sentence in this case is not impaired by the invalidity of one of the statutory aggravating circumstances found by the jury?" *Id.* at 1859. The Georgia Supreme Court has answered that question by stating that

[a] case may not pass the second plane into that area in which the death penalty is authorized unless at least one statutory aggravating circumstance is found. However, this plane is passed regardless of the number of statutory aggravating circumstances found, so long as there is at least one. Once beyond this plane, the case enters the area of the factfinder's discretion, in which all the facts and circumstances of the case determine, in terms of our metaphor, whether or not the case passes the third plane and into the area in which the death penalty is imposed.

*Zant v. Stephens,* 250 Ga. 97, 100, 297 S.E.2d 1, 4 (1982). Our cases accept a similar rationale underlying the use of statutory aggravating circumstances. *See State v. Shaw,* 636 S.W.2d 667, 675 (Mo.banc), *cert. denied,* —— U.S. ——, 103 S.Ct. 239, 74 L.Ed.2d 188 (1982); *State v. Bolder,* 635 S.W.2d 673, 682 (Mo. banc 1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 770, 74 L.Ed.2d 983 (1983). Nevertheless, we have never decided the question that the principal opinion would purport to decide. In *State v. Mercer,* 618 S.W.2d 1, 10 n. 5 (Mo. banc), *cert. denied,* 454 U.S. 933, 102 S.Ct. 432, 70 L.Ed.2d 240 (1981), we noted the Georgia Supreme Court's position on the issue, but we also noted that there is considerable authority to the contrary. The evidence in that case fully supported both of the aggravating circumstances that the jury found, *id.* at 10, and thus there was no issue of the failure of one of the aggravating circumstances.

The principal opinion's statement is of course only dictum, but it nevertheless is a strong dictum. I think it imprudent in advance of necessity to decide the issue it purports to settle, especially by making such an unqualified statement. In *Zant* the Georgia Supreme Court refused to adopt such an unconditional holding. That court stated that

[a] different result might be reached in a case where evidence was submitted in support of a statutory aggravating circumstance which was not otherwise admissible, and thereafter the circumstance failed. Furthermore, this court must consider each case involving a failure of one or more of a multiple of statutory aggravating circumstances to determine whether, because of the failure, the sentence was imposed under the influence of an arbitrary factor.

250 Ga. at 101, 297 S.E.2d at 4.

We should not be quick to speak to this important issue. We should await a case in which the question is squarely presented so that we can give it full consideration. Perhaps by that time, too, we will have the guidance of the Supreme Court's final decision in *Zant.*

ROBERT E. SEILER, Senior Judge, concurring in part and dissenting in part.

I concur with that portion of the principal opinion which affirms the conviction of capital murder, but I respectfully dissent with respect to affirmance of the death penalty. My problem with the principal opinion in this regard is that it does not, in my opinion, demonstrate that the sentence of death is not excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

If there is anything clear it is that for a death penalty statute to be valid, the statute must provide a "principled way to distinguish this case, in which the death penalty was imposed, from the many cases in which it was not." *Godfrey v. Georgia,* 446 U.S. 420, 433, 100 S.Ct. 1759, 1767, 64 L.Ed.2d 398 (1980); See also *Proffitt v. Florida,* 428 U.S. 242, 258, 96 S.Ct. 2960, 2969, 49 L.Ed.2d 913 (1976) (opinion of Stewart, Powell, and Stevens, JJ.) ("similar

results ... in similar cases"); *Furman v. Georgia,* 408 U.S. 238, 313, 92 S.Ct. 2726, 2764, 33 L.Ed.2d 346 (1972) (White, J. concurring) ("meaningful basis for distinguishing the few cases in which it is imposed from the many cases in which it is not"); *Lockett v. Ohio,* 438 U.S. 586, 605, 98 S.Ct. 2954, 2965, 57 L.Ed.2d 973 (1978) ("we cannot avoid the conclusion that an individualized decision is essential in capital cases"); *State v. Baker,* 636 S.W.2d 902, 911 (Mo. banc 1982) ("After examining these cases [referring to other cases] and giving to each of them the individualized consideration required ... we find that they do not point to excessiveness or disproportionality in the sentence in this case.")

The response of the Missouri legislature to the above requirement was to enact § 565.014.3(3)[1] which imposes on the court the duty of determining "whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant" and § 565.014.5(2) which authorizes us in instances of excessiveness or disproportionality to set the death sentence aside and remand for resentencing, as we did in *State v. McIlvoy,* 629 S.W.2d 333, 342 (Mo. banc 1982).

The principal opinion disposes of this aspect of the appeal with a single sentence at the close of the opinion, stating the conclusion that the penalty imposed is not excessive or disproportionate and citing, without elaboration, *State v. Stokes,* 638 S.W.2d 715 (Mo. banc 1982).

In *Stokes,* a thirty-three year-old divorcee, mother of three children, was found dead on the floor of her bedroom, nude, with a pillow case over her head and an apron wrapped around her neck, three days after she and defendant had left a bar together one night to go to her apartment. Her apartment was in disarray, with the bedroom ransacked. Her pendant watch and her automobile were missing.

The autopsy disclosed the following:

"... a shallow incision, over the left upper chest just beneath the clavicle, that was two inches in length, one and one-half inches in width and just beneath the skin; a cut on the back of the right hand; a cut on the surface of the hand; a deep cut over the back; a large cut in the posterior aspect of the lower third of the right arm which measured three inches in length, one-half inch wide and two inches deep, extending to the bone; a large area of bruising that was slightly raised and purple over the left side of the chest; a large bruise internally over the left side of the chest; numerous bruises and abrasions on both sides of the neck, some irregular, and others in a straight line running around to the posterior aspect of the neck; the right side of the lips were swollen and dark purple; dried blood was present in and outside the nose; several scrapes or abrasions were present on the face, one on the right side of the nose and another on the right temple; multiple areas of hemorrhage within the neck muscles; areas of fresh hemorrhaging in the thyroid gland and in the larnyx; one of the angles of the hyoid bone had been broken recently; a rather large abrasion over the back and sacrum; a superficial, one-fourth inch deep cut into the subcutaneous fat on the right chest in the shape of a round puncture; and, a slight abrasion to the right knee; liver mortis was evident; examination of the vagina revealed spermatoza and it was thought that the victim had sexual intercourse within six hours of death; that the cause of death was manual strangulation although some linear abrasions apparently had been caused by the apron; that the victim was alive at the time of injury to the chest area as reflected by the condition of the resultant bruises; and, that death had occurred more than one day prior to the autopsy.

The defendant, Stokes, had an extensive record of prior convictions: one manslaughter, one second degree murder, three first degree robberies, three escapes, armed criminal action and theft of an automobile.

1. All statutory references are to RSMo 1978.

The jury assessed the death penalty and found four statutory aggravating circumstances:

1. Substantial history of serious assaultive convictions. § 565.012.2(1).

2. Murder for purpose of receiving something of value. § 565.012.2(4).

3. Murder involving torture or depravity and as result thereof outrageously or wantonly, vile, horrible or inhuman. § 565.012.2(7).

4. At the time of the murder defendant had escaped from custody. § 565.-012.2(9).

In deciding the proportionality question of the death penalty the court first pointed out that the evidence supported the finding of the four specified statutory aggravating circumstances above. The court then returned to the "torture or depravity of mind" aggravating circumstance and divided the evidence on this aggravating circumstance into four types of acts:

1. The severe beating of the victim about the head and upper chest.

2. The five stab wounds caused by a sharp instrument.

3. The apron wrapped around the neck with minor linear lacerations in the flesh, indicating that the murderer attempted to strangle the victim by tightening the apron in garrotte like fashion.

The court pointed out the evidence was that all of the above injuries were sustained while the victim was yet alive.

4. Manual strangulation of the victim, as shown by violent internal damage to the neck, thus exaggerating the serious physical abuse inflicted prior to actual death.

When we consider both the crime and the defendant, *Stokes* and the present case are dissimilar. Stokes had such a bad previous record that he fell in the class of those who have a substantial history of serious as-saultive convictions. In the present case the state did not even attempt to make such a charge against defendant and there was no evidence to support such a charge.[2] In addition, Stokes murdered to obtain something of value and did so at a time when he was an escapee. As to the torture and depravity comparison, the victim in the *Stokes* case had been badly beaten about the head and chest, had been stabbed at least five times, had been subjected to an attempted garrotting by tightening of an apron around her neck, violent enough to leave linear imprints in her flesh, and then had been manually strangled with force sufficient to produce internal hemorrhaging in the neck and fracture of the hyoid.

In the present case there was testimony as to bruises or contusions on the victim's forehead and right arm, but no contention is made that the victim was beaten as in *Stokes.* The autopsy disclosed two direct stab wounds to the chest, one of which penetrated both ventricles of the heart and which the pathologist testified "most assuredly would have caused death." The other stab wound was into the upper lobe of the left lung. In addition the victim's throat was cut, a wound which might not have caused death had prompt medical attention been available, according to the pathologist. As it was, the victim bled to death, almost a gallon of blood being found in the left chest. Vaginal examination disclosed no evidence of recent sexual activity.

Presumably the *Stokes* jury relied on all four statutory aggravating circumstances in assessing the death penalty. In the present case there was only one statutory aggravating circumstance. The factors which the court relied upon to uphold the death penalty in *Stokes* have not been demonstrated to be present in the case at bar. If *Stokes* is the bench mark, this case does not meet it.

2. In the present case the jury did find as a nonstatutory aggravating circumstance the fact that defendant had been convicted of rape in Kansas in 1974. The record contains no information as to the degree of rape, its severity, the age or condition of the victim or the length of sentence. The sentence could not have been too severe, as defendant obviously was out of prison in 1980. So far as rape itself is concerned, a death sentence for rape would be unconstitutional. *Coker v. Georgia,* 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977).

The main thing which the *Stokes* case and the present case have in common is that in each the jury found the statutory aggravating circumstance of § 565.012.2(7)—the one involving torture or depravity of mind. Some of our statutory aggravating circumstances permit an objective determination, such as, for example, whether the capital murder is committed for something of value, or against a police officer on duty, or by one who is an escapee at the time. But the one about the offense "being outrageously or wantonly vile, horrible or inhuman in that it involves torture or depravity of mind" calls for a subjective analysis on the part of the jury of terms which are emotionally provocative. Juries have no way to see how the crime before them and the imposition of the death penalty therefor compares to similar cases. Only this court is in a position to do that. I take it that the principal opinion is not meant for the proposition that where a jury in one case finds the statutory aggravating circumstance of § 565.012.2(7) and assesses the death penalty it follows that the death penalty is not excessive or disproportionate simply because another jury in some earlier case also found the same class of aggravating circumstance and assessed the death penalty. The principal opinion certainly makes no such declaration and if we were to find lack of disproportionality from the mere fact that both the jury here and the jury in *Stokes* found the same class of statutory aggravating circumstance—torture and depravity, then we would end our inquiry before it even began. We would be placing absolute control in the hands of the jury so long as it finds the same class of aggravating circumstance as found in some other case where the death penalty was affirmed. This sort of unbridled jury discretion in sentencing to death would violate due process, as established by the cases cited at the outset hereof. The jury was the sole determiner before *Furman;* it cannot be so now.

The statute enjoins this court to look at "similar cases, considering both the crime and the defendant." The crime, of course, is the capital murder itself—what took place, what the defendant did. As for "similar", according to Webster's Third New International Dictionary (1967), p. 2120, it means having characteristics in common, alike in substance or essentials. All capital murders are alike in having the essentials called for by the statute defining the crime, § 565.001, and, factually, all have the characteristic of being worse than an ordinary homicide.

There is a vast array of capital murder cases in Missouri where what took place was equally or more revolting than what took place in the case at bar—cases which involve more killings, more stabbing, more blood, more callousness, more the mark of the beast—yet the punishment assessed was not death, but life imprisonment without possibility of parole for fifty years. Many of these are capital murders where stabbing and cutting have been the cause of death and where the state has sought the death penalty[3] with the aggravating circumstance of torture or depravity under § 565.012.2(7) being submitted to the jury. Others involve capital murders by shooting.

Making comparisons with similar cases involves a subjective analysis on our own

---

**3.** If we were to include in our universe or pool of cases for comparison, cases where the state, for some unstated reason, did not seek the death penalty, we would be hard put to find similar results in similar cases. We would be confronted with cases such as *State v. Holmes,* 609 S.W.2d 132 (Mo. banc 1980) and *State v. Hudgins,* 612 S.W.2d 769 (Mo.1981). In *Holmes,* the defendant stabbed his sixteen year-old victim at least sixty four times with an ice pick like instrument, including nine separate wounds to the heart—torture and depravity in the extreme. Defendant had three days earlier announced his intention to kill the victim, even specifying that he would do it by stabbing him some sixty odd times. In *Hudgins,* defendant's landlord died from loss of blood after defendant stabbed her twenty-one times as well as strangling her. Some of the wounds were seven inches deep. Defendant then strangled her six year-old son with an extension cord and placed the body in a bathtub filled with water. In both these cases the penalty was not death, but life without parole for fifty years. It is difficult to reconcile the outcome in these cases with the outcome in the present case.

part, but we have the time and the means by which to compare cases and then articulate why or what it is that causes us to reach the end result. Where do we find ourselves as to excessiveness or disproportionality of the death sentence in the present case when we compare it to these many cases, some of which are set forth briefly below, where the jury assessed not death, but life without parole for fifty years?

In *State v. Mitchell,* 611 S.W.2d 223 (Mo. banc 1981) and *State v. Turner,* 623 S.W.2d 4 (Mo. banc 1981), defendants were each found guilty of two counts of capital murder. They robbed a liquor store and killed the proprietor, age 72, and his employee, age 60. Both victims had been stabbed, one six to eight times in the chest and abdomen, and the other fifteen times, nine in the front part of the body and six in the back. Both victims also had severe wounds to the head from a blunt instrument such as a beer bottle or gun butt. In the *Mitchell* case, the jury was unable to agree on punishment and so, under § 565.006.2, defendant was sentenced to life without parole for fifty years on each count. In *Turner,* the jury assessed punishment on each count at life without parole for fifty years, not death.

In *State v. Fuhr,* 626 S.W.2d 379 (Mo. 1982), defendant, age 23, killed a forty-three year-old woman. The victim was stabbed twenty-nine times with a butcher knife. Money, a wallet, and rings were taken from the victim. The robbery was planned by the victim's daughter who asked the defendant to help. Some of the stab wounds had a depth of seven inches. The jury convicted defendant of capital murder and assessed the punishment not at death, but at life without parole for fifty years. The case was reversed and remanded for failure to instruct on first degree murder in the commission of robbery. Nevertheless, the jury's assessment of life rather than death establishes what the maximum punishment can be in this case on retrial in event of conviction of capital murder. *Bullington v. Missouri,* 451 U.S. 430, 101 S.Ct. 1852, 68 L.Ed.2d 270 (1981). The case therefore, is properly one for comparison.

In *State v. Hurt,* No. 64213, pending in this court, the defendant, age 19, an inmate in the state penitentiary, stabbed his 21 year-old cellmate to death with a knife. There were more than sixty stab wounds. The jury assessed punishment not at death, but at life without parole for fifty years. I realize this case has not been decided, but in other cases, we have referred to the facts in pending cases in determining proportionality. See *State v. Shaw,* 636 S.W.2d 667, 676 (Mo. banc 1982), where the court referred to the then pending case of *State v. Trimble* [638 S.W.2d 726 (Mo. banc 1982)] as a case involving the same aggravating circumstance as the *Shaw* case and one where the jury imposed the death penalty. Footnote 4 in the *Shaw* opinion points out that "We consider this case only to determine what penalty juries have imposed in factually similar situations" and cited *State v. Bolder,* 635 S.W.2d 673, 685 (Mo. banc 1982) in support. Footnote 8 in the *Shaw* case refers to *State v. Baker,* which had been argued and not yet decided at the time of *Shaw* (the jury imposed the death sentence in the *Baker* case) and also referred to another case pending here at the time but not yet argued, *State v. Davis,* No. 63474, where the jury assessed life without parole for fifty years, pointing out that the *Davis* case had evidence of extreme mental or emotional disturbance, something not present in *Shaw.* 636 S.W.2d at 676. In *State v. Baker,* mentioned above, 636 S.W.2d 902, 910 (Mo. banc 1982), the court, in considering proportionality of the aggravating circumstance of killing a police officer on duty, referred to *State v. Davis,* then pending in this court and which involved the same aggravating circumstance.

In *State v. Laws,* No. 63911, also pending in this court, defendant, age 31, with others, stabbed, choked and burned a 58 year-old man. The victim was kicked in the face, stabbed, and burned, although it could not be determined whether the victim was burned alive or was already dead. The victim was held hostage during the crime. The jury assessed punishment, not at death but life without parole for fifty years.

In *State v. Scott,* No. 63989, recently transferred to the court of appeals, defendant, age 16, stabbed to death a 60 year-old woman. Defendant and another man forced their way into the victim's home at gunpoint to rob the victim and her 88 year-old husband. While inside the house, defendant systematically stabbed the victim twenty-two times, tore out patches of her hair and scalp, and kicked her as she lay dying. The jury assessed punishment, not at death, but at life without parole for fifty years.

In *State v. Woods,* No. 62378, recently transferred to the court of appeals, defendant, age 25, stabbed to death a 21 year-old woman. The victim was stabbed seven or eight times. The jury assessed punishment not at death, but at life without parole for fifty years.

There are other Missouri cases where death is due either to shooting or strangling, not stabbing, and the statutory aggravating circumstance of torture or depravity has been submitted to the jury, yet the outcome has been life without parole for fifty years, not the death sentence. For example, in *State v. Gardner,* 618 S.W.2d 40 (Mo.1981), defendant, age 24, participated with George Mercer [see *State v. Mercer,* 618 S.W.2d 1, 11 (Mo. banc 1981)], in the strangulation killing of a 23 year-old woman. Defendant brought the victim to a house where Mercer was staying. Mercer forced the victim into a room where he raped her. Gardner subsequently raped her also. Gardner left the house saying that Mercer should kill the victim. Mercer strangled the victim to death and disposed of her body. As said, Gardner's punishment was fixed at life without parole for fifty years, not death.

In *State v. Borden,* 605 S.W.2d 88 (Mo. banc 1980), defendant, a 35 year-old woman, was convicted of the slaying of her husband. She fired a sawed-off .22 caliber rifle at him in his home where he was watching television. The couple's two small children were in the house at the time. At the time of the killing, defendant was engaged in an illicit romance. She had previously attempted to persuade her paramour to kill her husband.

In *State v. Bostic,* 625 S.W.2d 128 (Mo. 1981), defendant, age 35, struck and killed a 56 year-old woman. The victim was struck twice on the head with a pipe, dragged down the alley and loaded in a van. The defendant stepped on the victim's throat when she regained consciousness. The body was left in a ditch outside the town. Defendant also assaulted deceased sexually. The jury, instructed on the depravity of mind aggravating circumstance, put the punishment at life without parole for fifty years, not death.

In *State v. Laws,* No. 63983, recently transferred to the court of appeals, Laws, age 31, in concert with another, held hostage for more than an hour, shot and burned an 85 year-old woman while in the process of a burglary. The victim was also struck at least once in the head. The trial judge commented that the death sentence would have been appropriate had the jury elected to assess it. Instead, the jury assessed punishment at life without parole for fifty years.

*State v. Baskerville,* 616 S.W.2d 839 (Mo. 1981) is a good example of the lack of consistency in assessment of punishment for capital murder in this state when we compare cases. In *Baskerville,* the defendant was convicted of three counts of capital murder. The state sought the death penalty. One victim was shot twice, one was shot once, and a third, a child who begged for his life, was shot once. The jury, however, assessed punishment at life without parole for fifty years for the murders of the two adults, and the jury being unable to agree upon punishment for the capital murder of the child, the court assessed the same sentence in his case.

In its brief the state stresses that the death penalty should be sustained because the victim had "an opportunity to contemplate her fate" in that she was chased through her home. Yet in *State v. Royal,* 610 S.W.2d 946 (Mo. banc 1981), which was one of the cases used by the court for comparison purposes in *State v. Newlon,* 627 S.W.2d 606, 623 (Mo. banc 1982), the victim, a woman employee of the bank in

Neeleyville, was abducted during the bank robbery, forced into the car and driven to a remote rural area of Butler County where she was shot three times. The lengthy ride must have been increasingly terrifying and ominous to the helpless victim. The jury, however, assessed punishment at life without parole for fifty years, not death.

In discharging our duty to see that the sentence of death is not disproportionate to the penalty imposed in similar cases, we have stated "Our concern is that there be 'even-handed, rational and consistent imposition of death sentences under law'. *Jurek v. Texas*, 428 U.S. 262, 276 [96 S.Ct. 2950, 2958, 49 L.Ed.2d 929 (1976)", *State v. Bolder*, 635 S.W.2d 673, 684–85 (Mo. banc 1982). I fail to see where the present case has been distinguished in a principled or meaningful way from the many cases above where the homicide was just as bad or worse, yet the jury elected life without parole for fifty years as punishment, not death. If we for whatever reason, do not make the distinction (and I do not believe it can be made here), then I do not believe the death penalty can stand in the particular case under consideration. I would therefore set aside the death sentence and remand for sentencing.